**UNITED STATES of America,**
**Plaintiff,**

v.

**INTERNATIONAL BOXING CLUB OF NEW YORK, Inc., a corporation of New York; International Boxing Club, a corporation of Illinois; Madison Square Garden Corporation, a corporation of New York; James D. Norris; and Arthur M. Wirtz, Defendants.**

United States District Court
S. D. New York.
March 8, 1957.

Dept. of Justice, New York City, for the United States.

Simpson, Thacher & Bartlett, New York City, for defendants Madison Square Garden Corp. and International Boxing Club of New York, Inc., Whitney North Seymour, Benjamin C. Milner, III, Armand F. Macmanus, Newell G. Alford, Jr., New York City, of counsel.

Reid & Priest, New York City, Peabody, Westbrook, Watson & Stephenson, Chicago, Ill., for defendants International Boxing Club, Inc., James D. Norris and Arthur M. Wirtz, Charles H. Watson, Ralph M. McDermid, New York City, of counsel.

Herbert Brownell, Jr., Atty. Gen., Victor R. Hansen, Asst. Atty. Gen., Victor H. Kramer, New York City, Richard B. O'Donnell, John D. Swartz, William J. Elkins, Lawrence Gochberg, Frank D. Curtis, Edward F. Corcoran, Attys.,

## OUTLINE OF OPINION

1. THE ISSUES PRESENTED.

2. FINDINGS OF FACT.

    I. Description of Defendants and Others.

    II. Professional Boxing.

    III. State and Municipal Regulation of Professional Boxing.

    IV. The Trade and Commerce Involved.

    V. The Interstate Character of This Trade and Commerce.

    VI. The Promotion of Championship Contests—a Separate Part of This Interstate Commerce.

    VII. The Sale of Television and Broadcast Rights to Championship Contests—a Separate Part of This Interstate Commerce.

    VIII. The Defendants' Position in the Professional Boxing Business in 1949.

    IX. The Unlawful Combination and Conspiracy.

        a. The defendants combine and conspire.
        b. The Garden joins the combination and conspiracy.

    X. The Conspiracy Afoot.
        a. Elimination of competitors.
            1. Michael S. Jacobs and Twentieth Century Sporting Club, Inc.
            2. Tournament of Champions, Inc., Sporting Events, Inc., and Columbia Broadcasting System.
        b. Defendants' control of important stadia and arenas.
        c. Defendants' exclusive contracts with contenders for championship.

    XI. The Results of Defendants' Conspiracy.

3. THE LAW APPLICABLE TO THE FINDINGS OF FACT.

4. CONCLUSIONS OF LAW.

RYAN, District Judge.

This civil anti-trust suit was filed on March 17, 1952 by the United States under Section 4 of the Sherman Act, C. 647, 26 Stat. 209, as amended, 15 U.S.C. A. § 4, to prevent and restrain violations by the defendants of Sections 1 and 2 of the Act, 15 U.S.C.A. §§ 1, 2. The amended complaint alleges, in substance, that the defendants combined and con-

spired in restraint of, and to monopolize, and have monopolized, interstate and foreign commerce in the promotion of professional championship boxing contests, including the sale of radio, television and motion picture rights thereto.

Defendants' motion to dismiss the complaint for lack of jurisdiction over the subject matter, i. e., for lack of interstate commerce and for failure to state a claim upon which relief can be granted, was granted on February 8, 1954. The United States appealed directly to the Supreme Court, which reversed the judgment of dismissal and remanded the suit for trial, United States v. International Boxing Club of New York, Inc., 1955, 348 U.S. 236, 75 S.Ct. 259, 99 L. Ed. 290. This determination was a holding that accepting the allegations of the complaint, a claim was stated entitling the Government to some form of relief and that " * * * the Government is entitled to an opportunity to prove its allegations * * * ."

I note, with gratitude and appreciation, that I have had the utmost cooperation from counsel both in the pre-trial hearings and at trial. This expedited the presentation of the evidence and shortened the trial.

## 1.

### THE ISSUES PRESENTED

The complaint alleges that the defendants, beginning in 1949, combined and conspired in restraint of and to monopolize interstate trade and foreign commerce in the promotion, exhibition, broadcasting, telecasting and motion picture production and distribution of professional championship boxing contests in the United States. The Government contends that the combination and conspiracy resulted in a monopolization, and that it consisted of a concert of action among the defendants to exclude others from the promotion and exhibition of and the sale of radio, television and motion picture rights in professional championship boxing contests in the United States.

The acts alleged to have been committed by the defendants, pursuant to the conspiracy and combination, are: (1) purchasing of promotional control of certain championships, (2) acquiring the assets of competitors, (3) acquiring the exclusive use of principal stadia and arenas, and (4) requiring each of certain contenders for a title, as a condition of being afforded an opportunity to engage in a championship contest, to enter into a contract pursuant to which the contender, if he won the contest and thereby became champion, was required to engage in title bouts only under the promotion of defendants for a period of from three to five years.

The complaint alleges that defendants have promoted, or participated in the promotion of, 80% of all championship contests presented in the United States during the period between January 1, 1949 and May 15, 1953.

Specifically, then, the complaint alleges that the trade and commerce involved in suit is the business of promoting championship boxing contests on a multistate basis, which includes the staging of the boxing contest in a suitable arena, the sale of tickets of admission, and the negotiations and sale of rights to broadcast, televise and to make and distribute motion pictures of such contests. This, the Supreme Court has held, "constitutes 'trade or commerce among the several States' within the meaning of the Sherman Act", United States v. International Boxing Club of New York, Inc., supra, 348 U.S. at page 240, 75 S.Ct. at page 261. The complaint further alleges that, in addition to monies received from the sale of tickets of admission, a substantial portion of the total revenue from championship fights comes from the sale of rights involving radio, television and motion pictures.

The answers deny that defendants have unlawfully conspired or combined, or that they have, either individually or collectively, a monopoly within the meaning of the Sherman Act. The main thrust of the defense lies in the conten-

tion that championship boxing contests are not independent of and would not exist without non-championship contests and, therefore, the promotion of championship boxing contests does not constitute a relevant "market" for purposes of testing violations of Sections 1 and 2 of the Sherman Act.

The Government argues that the promotion and exhibition of, and the sale of radio, television and motion picture rights in professional championship boxing contests constitute a "market" for purposes of determining whether there were restraints of trade and monopoly as alleged. The defendants urge that the relevant market is the entire entertainment field (or, at the very least, the promotion of all boxing contests). They contend that if the sale of radio, television and motion picture rights with respect to championship bouts have material significance, such a finding would serve only to establish that the correct and relevant market is the entire entertainment field.

The Government, charging the defendants, as it does, with having violated Sections 1 and 2 of the Act, has the burden of establishing the relevant market as well as the elements of the offense as set forth in the Act. Thus, to sustain its charge that the defendants conspired to monopolize, the Government must prove that the defendants had a specific intent to monopolize, Swift & Co. v. United States, 1905, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518; and to establish that the conspiracy charged was successfully consummated, that the defendants did in fact monopolize the relevant market, that they were " * * * able, as a group, to exclude actual or potential competition from the field", American Tobacco Co. v. United States, 1946, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575.

The basic issues presented for determination as they have been framed and submitted by the defendants are:

1. Were the activities of defendants in connection with the promotion and exhibition of championship boxing contests interstate trade and commerce within the meaning of Sections 1 and 2 of the Sherman Act? and

2. If the defendants' activities were interstate trade and commerce, was Section 1 or Section 2 of the Sherman Act violated by them?

The Government called eight witnesses, and introduced 268 exhibits; defendants called seven witnesses and offered 13 exhibits. On consideration of all this evidence, I make the following findings of fact.

## 2.

## FINDINGS OF FACT

**I. Description of Defendants and Others.**

1. Defendant International Boxing Club of New York, Inc. (hereinafter referred to as IBC(NY) ), is a New York corporation with offices and principal place of business in New York, New York. It was formed on March 14, 1949. From about July 1949 to May 15, 1953, the end of the period covered by the Amended Complaint (hereinafter referred to as Complaint), about 80% of its voting stock was substantially equally divided between defendants Wirtz and Norris and the defendant Madison Square Garden Corporation, while the remaining approximate 20% was owned by Joe Louis or Trustees for his benefit. It has been engaged in the promotion of professional boxing contests including professional world championship boxing contests. During the period July 1949 to the present it has held a license to promote boxing matches in New York issued by the New York State Athletic Commission. It is found and transacts business in this District.

2. Defendant International Boxing Club, Inc., an Illinois corporation (hereinafter referred to as IBC(Ill.) ), has offices and principal place of business in Chicago, Illinois. It was formed on March 1, 1949. From about July 1949 to May 15, 1953, about 80% of its voting stock was substantially equally divided between defendants Wirtz and Norris and the defendant Madison Square Gar-

den Corporation while the remaining approximate 20% was owned by Joe Louis or Trustees for his benefit. It has been engaged in the promotion of professional boxing contests including professional championship boxing contests. During the period July 1949 to the present it has held a license to promote boxing contests in Illinois issued by the Illinois State Athletic Commission.

3. Defendant Madison Square Garden Corporation (hereinafter referred to as Garden), is a New York corporation with offices and principal place of business in New York, New York. It was organized to own and operate the arena building in New York City known as Madison Square Garden which was built in 1925–6. Throughout the period covered by the Complaint, it has engaged, among other things, in the management and operation of the Madison Square Garden Arena including the promotion of various spectacles and contests held there. It is the foremost indoor sports arena in New York City and is utilized for various indoor sports events, including professional boxing contests and other events and spectacles. It is found and transacts business in this District.

4. Defendant James D. Norris, a resident of Chicago, Illinois, was president and a director of IBC(Ill.) and IBC(NY) from March 24, 1949 and July 8, 1949, respectively, and thereafter throughout the period covered by the Complaint and since. He has been a director of IBC (Mich.) since its incorporation and the president of that corporation since August 11, 1949. He has also been the president and a director of IBC(Mo.). He has been a director of the Garden since December 19, 1950, and has been its president since June 9, 1955. At all times mentioned in the Complaint he had a substantial stock interest in the Garden.

5. Defendant Arthur M. Wirtz, a resident of Chicago, Illinois, was a director of IBC(Ill.), of IBC(NY), and of the Garden from March 24, 1949, July 8, 1949, and December 19, 1950, respectively, and thereafter throughout the period

covered by the Complaint and since. He has been a director of IBC(Mich.) since its incorporation; he has also been a director of IBC(Mo.) since September 26, 1950, and vice-president and secretary since January 12, 1950. At all times mentioned in the Complaint he had a substantial stock interest in the Garden.

6. The International Boxing Club, Inc., a Michigan corporation (hereinafter referred to as IBC(Mich.) ), was organized under the laws of the State of Michigan on July 12, 1949 to promote professional boxing matches in Michigan. It was a wholly owned subsidiary of IBC(Ill.) until December 28, 1950, and thereafter throughout the period covered by the Complaint, it was jointly controlled by the defendants Wirtz and Norris.

7. The International Boxing Club, Inc., a Missouri corporation (hereinafter referred to as IBC(Mo.) ), was organized under the laws of the State of Missouri. From October 23, 1950 and thereafter throughout the period covered by the Complaint, it was jointly controlled by defendants Wirtz and Norris.

8. The defendants Norris and Wirtz participated in the direction and management of the defendants IBC(NY), IBC(Ill.), IBC(Mich.), IBC(Mo.) and, since December 19, 1950 of the defendant Garden, and particularly in those affairs, policies, and acts of the said corporations described more fully in these Findings of Facts. Each of the individual defendants has authorized, ordered, or done some or all of the acts hereinafter described.

## II. Professional Boxing.

9. Professional boxing is a legalized sport which has become a business and which is conducted as a form of public entertainment. All who engage in it, either as boxer participants, managers or promoters are motivated to some extent by the desire of profit or monetary gain. It consists of a contest between two individuals each of whom uses his fists, bandaged, taped and encased in

padded gloves, to attack his adversary with blows above the waist line and to ward off his adversary's blows. The winner is the boxer who either renders his adversary unable to continue, or failing that, receives the decision of the official judges at the end of the contest. A boxer may also win by the disqualification or default of his adversary.

10. The contest takes place on a square, covered, platform, enclosed by ropes, located in an arena to which members of the public are admitted upon presenting tickets of admission, which may be purchased at the gate.

11. The contestants are matched according to weight classes. There are eight recognized weight classes: flyweight (to 112 lbs.); bantamweight (to 118 lbs.); featherweight (to 126 lbs.); lightweight (to 135 lbs.); welterweight (to 147 lbs.); middleweight (to 160 lbs.); light heavyweight (to 175 lbs.); and heavyweight (over 175 lbs.). In the United States the two lightest classes have little practical importance. No flyweight championship bout has been held in the United States since 1935, and no bantamweight championship has been held in the United States since 1947.

12. In each weight class there is at any one time ordinarily one recognized world champion. Recognition as a world champion is a lucrative asset to any professional boxer and attaining the world championship is generally sought by all professional boxers in the division in which they compete. It places the individual so recognized in a position to obtain more for his services than those who have not been so recognized. Contests in which these champions participate have greater box-office appeal, arouse greater public interest, have larger audience participation and bring in more revenues from sale of admission tickets, or "gate," and sale of other rights to the contest. There are other emoluments which come to the recognized world champion by way of commercial endorsements and advertising programs.

13. The champion becomes such either by defeating the existing champion in a recognized title contest, or, if the champion has retired or his title is declared vacated, by engaging with one or more recognized top contenders in a contest, or series of contests, recognized as title, or title elimination contests by authorities such as the New York State Athletic Commission and the National Boxing Association (an association of the state and municipal boxing commissioners, hereinafter referred to, from time to time, as NBA). Although there are sometimes differences of opinion as to who is the champion, such differences are infrequent. The field of champions and potential champions is limited by reason of the prowess of the few who have gained the public recognition of those who are "fans" or followers of the contests. It is reasonable to say that, at any one time, there are at most only six or so professional boxers who can defend a world championship title.

14. A boxing contest is a single bout between two boxers. Depending upon the circumstances it may be scheduled for 4, 6, 8, 10, 12 or 15 rounds of three minutes duration with rest periods of one minute between rounds.

15. A boxing contest is not staged in an arena except as part of a program or series of boxing contests, known as a boxing card. Each boxing card includes a main event. The professional championship boxing contests are generally staged with a number of "preliminaries," minor or insignificant contests, usually five or six in number. The minor contests have little or no interest to those who attend the championship contests; they have no drawing power or box-office appeal, and are staged only that the main or championship event may be orderly presented and allow for the entrance and exit of the spectators with a minimum of confusion.

16. Promoting professional boxing contests includes negotiation and execution of contracts with the boxers, the arranging of details necessary to the exhibition of the contest, the selling of tickets of admission, the staging of the contest, and the sale, if any, of radio,

television, or motion picture rights to such contests.

### III. State and Municipal Regulation of Professional Boxing.

17. Professional boxing is conducted in many of the states and localities under rules and regulations of governmental authorities; in many instances under a licensing system by which control and supervision is exercised over the boxers and their managers, promoting corporations, the referees, judges, match-makers, time-keepers and those in charge of the sales and distribution of admission tickets. This governmental regulation ofttimes extends to specific proposed boxing contests and boxing cards. Under the laws of New York and Illinois, and in certain other states in which professional boxing is permitted, a promoter's license may be issued only to a corporation organized under the laws of that State.

18. In New York the governing authority is the State Athletic Commission which is a Division of the Department of State. In Illinois that authority is the State Athletic Commission.

19. In New York the boxers and their managers, promoting corporations, the referees, judges, match-makers, time-keepers, box office employees, ticket takers, trainers, and announcers, among others, must be licensed by the Commission. The proposed boxing card must be submitted to the Commission for approval by it. From time to time the Commission disapproves proposed boxing contests.

20. In New York, the rules and regulations provide, among other things, for: the filing and some of the terms of the contracts between boxers and the promoter, and between boxers and their managers; the printing and handling of tickets; the actual conduct of the bout; the rules governing the functioning of officials, including the judges, referee, and timekeeper; the manner of scoring the contest; the classification of contestants on a weight basis; and medical examinations of the contestants. The rules and regulations in Illinois are similar and apply to the same subjects generally.

21. In New York all judges and referees must be assigned by the Commission. In any principal or main bout the contestants must be paid on a percentage basis and the licensed promoting corporation, without advance approval of the Commission, cannot pay the contestants an amount in excess of 50% of the net proceeds of the boxing program after the State tax and the compensation of the ring officials have been deducted.

22. Licensed promoting corporations are not allowed to conduct more than one program per week without the special permission of the Commission, and no such program may be called off or adjourned without the consent of the Commission.

23. It does not lie within our jurisdiction, to interfere with or attempt to modify or dictate the conditions under which those engaged in this professional boxing business shall operate on a local basis. It is our sole concern to inquire into such activities only insofar as they affect the interstate trade and commerce which has grown up and become an integral part of these activities; to that extent our jurisdiction is limited and by that limitation our inquiry is bound.

### IV. The Trade and Commerce Involved.

24. The trade and commerce involved in this suit is the promoting and holding of professional championship boxing contests and all the commercial activities, which are an important and integral part of a successful and complete operation of such business. This includes the staging of such championship boxing contests in a suitable arena or stadium; the sale of tickets of admission; the negotiation and sale of rights to broadcast and to telecast through home television consumption or closed circuit theatre television consumption; and to make and distribute motion pictures.

25. Each of these business phases of the professional championship boxing

contests provides substantial sources of revenue for the promoters and participants; not the least of which are the payments received from the sale of rights involving broadcasts by radio and television and the distribution and exhibition of motion pictures of the events.

26. The efficient promotion of these professional boxing contests includes the negotiation and execution of contracts with the boxers, the arranging of details necessary to the exhibition of the contests, the selling of tickets of admission, the staging of the contests, and the sale, if any, of radio, television or motion picture rights to such contests.

## V. The Interstate Character of This Trade and Commerce.

27. The defendants IBC(NY) and IBC(Ill.), in promoting professional world championship boxing contests, have made frequent use of the mails, the telephone, telegrams, cablegrams, radiograms, and their officers and agents have travelled across state lines and, in some cases, to foreign nations, to negotiate between themselves, with other promoters, and with boxers and managers. The defendant IBC(NY), in promoting championship contests, has sold a substantial number of admission tickets to professional world championship contests through the use of the mails to customers located in states other than those states in which the contests were held. A substantial number of people who purchased tickets in that manner crossed state lines to be present at such professional boxing contests.

28. Likewise, the defendants IBC (NY) and IBC(Ill.) have negotiated and executed contracts for the sale of rights to broadcast and telecast championship contests. Such negotiations have involved the frequent use of the mails, telephone and telegrams, and means of personal travel across state lines. The purchasers of such rights have broadcast and telecast, or caused to be broadcast and telecast, descriptions and views of such professional world championship boxing contests to private homes located throughout the United States and in the case of some radio broadcasts, in foreign countries.

29. The telecasting of championship contests is of such significance and importance that championship contests held outside the Eastern time zones are staged at unusual times, sometimes as early as 7 p. m. in order to be seen on television in the East at the traditional time of 10 p. m.

30. The locality in which a championship contest is presented is frequently "blacked out," i. e., the contest is not televised in such particular locality.

31. The defendants IBC(NY) and IBC(Ill.), in promoting professional world championship boxing contests, have, in some instances, negotiated and entered into contracts to sell the right to telecast professional world championship boxing contests, under which the contract purchaser agreed to arrange for the exhibition of such telecasts in motion picture theatres located in various states throughout the United States.

32. The defendants IBC(NY) and IBC(Ill.), in promoting professional world championship boxing contests, have, in some instances, negotiated and entered into contracts to sell the rights for the distribution of motion picture films of such contests, under which the contract purchaser agreed to arrange for the distribution of motion pictures of such contests for exhibition in theatres located throughout the United States and in foreign countries.

33. The thirty-six championship boxing contests which defendant promoted or had an interest in during the period June 1, 1949 through May 15, 1953, were held in the States of New York, Illinois, Michigan, Missouri, Massachusetts, Florida, Pennsylvania, Ohio and California.

34. The defendants, as promoters of championship contests, derive substantially all of their revenue from the sale of tickets of admission and from the sale of radio, television and motion picture rights to such contests, on the occasions when such rights are sold. The sale of tickets of admission and of the radio,

television and motion picture rights are in the control of the promoter.

35. The gross gate receipts plus monies received from the sale, if any, of rights to television, radio and motion pictures for the 44 professional championship boxing contests held in the United States during the period June 1, 1949 to May 15, 1953, were $8,759,326. Of that amount $6,347,594 or 72.4% was attributable to ticket sales and $2,411,740 or 27.6% was attributable to sale of said rights. In arriving at this gross receipts figure, and in making this comparison, gate receipts before payment of federal admission tax figures have been used because the price on the tickets includes such taxes.

36. The revenues derived from sales of tickets of admission to those 44 contests varied between $27,166.56 and $768,719.32.

37. The revenue derived from the sale of television, radio and motion picture rights to those 44 contests varied between $4,650 and $386,413.92 in the 29 bouts in which one or more of these rights were sold.

38. The 36 championship contests which the defendants promoted or had an interest in during the period June 1, 1949 through May 15, 1953, produced a total revenue of $7,100,944.92, of which $2,391,740.92 was derived through the sale of radio, television and motion picture rights.

39. During 1949 four championship contests promoted by the defendants, or from which defendants received income, produced total revenues of $569,859.73, of which $59,650.00 or about 10% was attributed to the sale of radio, television and motion picture rights to such contests.

40. During 1950 seven championship contests promoted by the defendants, or from which defendants received income, produced total revenues of $856,752.72, of which $215,000 or about 25% was derived from the sale of radio, television and motion picture rights.

41. During 1951 thirteen championship contests promoted by the defendants, or from which defendants received income, produced total revenues of $2,365,536.37, of which $946,531.92 or 40% was derived from the sale of radio, television and motion picture rights to such contests.

42. During 1952 nine championship contests promoted by defendants, or from which defendants received income, produced total revenues of $2,398,030.89, of which $863,558.00 or about 36% was derived from the sale of radio, television and motion picture rights to such contests.

43. The sale of television and radio broadcast rights to championship contests plays an important role in the promotion and staging of these contests, and is a matter of prime business importance. This is evidenced by the fact that the revenue from the sale of home television and radio rights to the Maxim-Murphy light-heavyweight championship contest, promoted by IBC(NY) in the Garden on August 22, 1951, was two and a half times greater than the revenues from the gate receipts after deduction of federal admission taxes, and in the Gavilan-Graham welterweight championship bout, promoted by IBC(NY) at the Garden Arena on August 29, 1951, the revenue from the sale of home television and radio rights produced approximately twice as much revenue as the sale of tickets of admission after deduction of federal admission taxes.

44. The telecasting of championship contests is of such significance and magnitude to the promoter that the presentations of such contests in New York City have become fewer because of the fact that with so many home television receivers in the New York metropolitan area, that area cannot be blacked out without materially reducing the value of the television rights to the sponsors.

45. The business of promoting championship contests is substantially dependent upon revenue from the sale of radio and television rights thereto and that fact is responsible, in great measure, for the manner in which the business is presently conducted.

46. The revenue received by defendants through the sale of motion picture rights to six championship contests presented between June 16, 1949 and May 15, 1953 and their participation in the filming and distribution as described in Finding 33, amounted to $616,560.19.

47. The income of the defendants from such a film usually depends on the amount of revenue derived from the distribution of the film in theatres located throughout the United States and in foreign nations.

48. The income of the defendants from the sale of rights to televise a championship contest through closed channels to moving picture theatres is based on a royalty for each seat in each theatre to which the bout may be transmitted or on the number of tickets sold to each such theatre.

49. A professional championship boxer, directly, or through his managers, negotiates with promoters on a bout-by-bout basis for a percentage of the gate receipts, plus a share of the revenue, if any, from the sale of radio, television or motion picture rights.

50. The revenues received by such boxers from the sale of radio, television and motion picture rights to the contests in which they engage represent a substantial part of the revenues received by the boxers from such contests.

### VI. The Promotion of Championship Contests—a Separate Part of This Interstate Commerce.

51. The gross income from gate receipts (less federal admission taxes) and from the sale of radio and television rights, and the distribution of motion pictures from all championship bouts promoted by the defendants from June 1, 1949 to March 17, 1952, averaged, as to each bout, $154,000. The gross income, computed in the same manner, from non-championship bouts promoted by defendants at the Garden Arena, Chicago Stadium, Yankee Stadium, and the Polo Grounds, all important stadia, between June 1, 1949 and March 17, 1952, averaged, as to each bout, $40,000.

52. The Charles-Maxim heavyweight championship bout held in the Chicago Stadium on May 30, 1951 was promoted by IBC(Ill.) and radio and home television rights to this bout were sold to Pabst Brewing Company for $100,000. However, similar rights to a non-championship heavyweight bout between these same contestants held about seven months later on December 12, 1951 were purchased by Pabst from defendant IBC (Ill.) for less than half of that price, i. e., for $35,000 in addition to a payment made on a series contract of about $10,-000, or a total of $45,000.

53. The Nielsen Average Audience rating is a percentage which purports to show the number of residential television sets that were tuned in to the program expressed as a percentage of the total residential television sets, whether turned off or on, which were in areas into which the program was telecast.

54. The average "Nielsen Share of the Audience ratings" (which are generally accepted by sponsors of television programs as accurate) for the non-championship contests presented beginning September 27, 1950 through May 15, 1953 by IBC(NY), IBC(Ill.), or by any promoter in connection with either of the IBCs and on which a "Nielsen" rating was made, is 57.7%, while the same average for championship contests presented during the same period is 74.9%.

55. The preceding Finding and the other "Nielsen" average ratings reflect that several millions more television viewers watch championship contests than watch major non-championship contests.

56. The televising of championship boxing contests has a particular demand and peculiar qualities in contradistinction to the televising of non-championship boxing contests.

57. The defendants recognized the special attractiveness and peculiar qualities incident to the promotion of championship contests, and in the agreement between Wirtz-Norris and the Garden to promote boxing contests jointly, they

specifically allocated the promotion of championship contests between them.

58. The defendants expressly limited their contingent, exclusive contracts with contenders for championships to championship contests, making it clear that they were not interested in obtaining exclusive rights to the promotion of non-championship bouts.

59. The intent of the defendants to confine such exclusive agreements to only championship contests was made clear by IBC(NY) reassuring Gavilan that his exclusive agreement was to become operative only if he won his contest with the then champion and thereby became champion himself and that the contract thereafter would not relate to any boxing contest other than championship contests.

60. Sponsors of televised boxing contests recognize that the televising of a championship contest has a unique advertising value for a sponsor in contradistinction to the televising of a non-championship contest.

61. A particular and special demand exists among radio broadcasting and telecasting companies for the rights to broadcast and telecast championship contests in contradistinction to similar rights to non-championship contests.

62. A particular and special demand exists among moving picture companies for the rights to make and distribute films of championship contests in contradistinction to similar rights to non-championship contests.

63. Although during the period June 1, 1949 through May 15, 1953 one or more of the defendants sold motion picture rights to 6 of the 44 championship contests presented, for amounts varying between $500.00 and $272,892.42 and for a total of $616,560.19, during the same period no full-length motion picture rights were sold to a non-championship contest.

64. A particular and special demand exists among promoters for championship contests in contradistinction to non-championship contests.

65. A substantial number of persons purchase tickets of admissions to attend professional championship contests who do not do so to attend non-championship contests.

66. A particular and special demand exists among spectators for championship contests in contradistinction to non-championship contests. Spectators pay substantially more for tickets of admissions to professional championship boxing contests than they pay for tickets to non-championship contests.

67. A separate, identifiable market exists for professional world championship boxing contests among boxers, spectators, sponsors of radio and television programs, owners of radio broadcasting and telecasting stations, moving picture companies, and promoters of professional boxing contests.

68. Professional boxing contests are staged or presented in arenas or stadiums.

69. A large variety of events can be and are staged, presented or held in arenas, where professional boxing contests are presented.

70. In a typical year there are about 2,000 professional boxing shows presented in arenas in the United States, of which approximately 9 to 13 are professional championship boxing contests.

71. There is a number of arenas in the United States where sporting events including boxing contests are presented in which none of the defendants has an interest.

■ 72. The exhibition of professional championship boxing contests does constitute a market separate and distinct from the exhibition of professional boxing contests, sporting events, and other forms of public shows, spectacles and entertainment.

VII. The Sale of Television and Broadcast Rights to Championship Contests Is a Separate Part of This Interstate Commerce.

73. The fact that a professional boxing contest is a show staged for public

entertainment presents those who have an immediate financial interest in the contest, including the boxers, their managers, and the promoter, with the opportunity, if purchasers are available, to sell the right to come upon the premises, with the necessary equipment, and pick-up or describe the contest for ultimate transmission to the public through various media of communication.

74. The most commonly sold rights during the period June 1, 1949 through May 15, 1953 and since, were television rights. Radio rights have been sold with television rights on a number of occasions. Theatre television rights and motion picture rights have also been sold.

75. The right to pick-up through cameras and telecast electronic reproductions of professional boxing contests, when sold, is sold to sponsors, or to advertising agencies for the account of their clients, who are sponsors, or to telecasting corporations for a resale to sponsors.

76. The sponsor is a commercial organization which uses advertising media to strengthen and increase public awareness and acceptance of its product or services.

77. Sponsors who have used the telecasting of boxing contests for advertising have, at the same time, used other advertising media. There is a large variety of shows and events available for television advertising sponsorship. Various sponsors choose various types of television programs as the most satisfactory competitive instrument to interest the public.

78. The general market that the sponsor seeks to reach is the television viewer who is free to watch its program and other programs which are being telecast at the same time.

79. There is a separate audience for championship contests as distinguished from the sports audience that is interested in viewing non-championship contests and other sporting events regularly or from time to time.

80. It is desirable for successful television advertising that the sponsor establish in the television user a continuity of viewing habit, if at all possible.

81. Continuity of viewing habit is established by making the viewing public aware that if it turns to a particular television channel at a particular time each week, it will see a television show of a kind and type which it will prefer to other programs available at the same time.

82. The sponsors who have purchased the television rights to the regular Friday night series of boxing contests of IBC(NY) and the regular Wednesday night series of boxing contests of IBC(Ill.), have purchased their telecasting time on a 52 week a year basis.

83. With infrequent exceptions, weekly boxing contest television shows have non-championship bouts as the main event. All championship boxing contests held in a given year if broadcast alone would not provide continuity to a television advertising program.

84. The sponsor of a boxing contest television show program has great interest in sponsoring the televising of a world championship boxing contest but endeavors to have such contest brought within its regular weekly series of boxing shows.

85. The purpose of including championship boxing contests among those shown on a regular television series is to bolster the viewing audience, by presenting to the public a special show which appeals to an additional separate audience in the hope that it will attract the attention of that separate group to the other programs regularly broadcast.

86. The sale of television, radio, or motion picture rights to professional championship boxing contests does constitute a market separate and distinct from the sale of such rights with respect to boxing contests and other forms of public entertainment.

### VIII. The Defendants' Position in the Professional Boxing Business in 1949.

87. Madison Square Garden is the foremost sports arena in New York City

and is the best known arena of its kind in the United States, if not the world. It was built in 1925 and succeeded to the name and tradition of old Madison Square Garden.

88. The Garden building is located in the hotel and theatrical district of mid-town Manhattan. It contains a very large arena with an exhibition hall in the basement. The arena's seating capacity is 18,000 for boxing shows, meetings and rallies; 15,000 for basketball and hockey, and 14,000 for the circus and rodeo.

89. The Garden has the facilities for the staging of a great variety of sports events, spectacles, meetings and rallies. Approximately 500 employees are employed at the Garden on a full or part time basis of whom about 50 are engaged in promotional activities including activities relating to the promotion of boxing. It is necessary for successful operation of the Garden that it have available each year a large number of events of outstanding quality which will maintain its prestige and attract adequate publicity and patronage.

90. Continuity in scheduling events is a vital part of the operation of the Garden. Sports events, in season, are held on particular nights of the week. Sunday and Wednesday nights are hockey nights, Thursday is basketball night, and Friday boxing night. Annual events which interrupt the regular schedule are known well in advance as to season and period of interruption. This continuity is maintained so that people can become accustomed to it.

91. The net income of the Garden from all events including boxing, reached a peak in 1947 and has declined steadily since that year. The net income for the fiscal year ending May 31, 1947 was $1,246,000. The net income for the fiscal year ending May 31, 1950 was $646,000. The net income for the fiscal year ending August 31, 1955 was $311,000. During the years 1950–1953 inclusive, IBC (NY) operated at a loss; in 1954 its net income was $37,000 and in 1955, $32,000.

92. Television was a major factor which accounted for the Garden's decline in income in the period 1947–1955. The advent of television affected unfavorably the gate receipts at the Garden as, indeed, it has many other forms of public entertainment. The Garden was able to offset this loss in patronage, to some extent, by the sale of television rights. This income began in 1947 and 1948 and reached a peak in 1952.

93. In 1935 Norris and Wirtz first acquired their interests in Chicago Stadium. The Stadium was completed in 1929 and has a seating capacity slightly larger than that of the Garden. The problem of getting profitable events into the Stadium is similar to the problem of getting such events for the Garden except that it has to finance a greater percentage of its attractions than the Garden. The entertainment provided by television as with the Garden has adversely affected the Stadium operation.

94. In 1933 Norris and Wirtz first acquired their interests in the Detroit Olympia which has a seating capacity of 12,000–14,000. Its operations are somewhat similar to the Garden but on a substantially reduced scale. It has about one-third as many bookings as the Garden, including hockey and ice shows and an occasional boxing match. Since 1954 Wirtz has had no stock interest in the Detroit Olympia.

95. In 1946 Norris and Wirtz first acquired their interests in the property of which the St. Louis Arena is a part. The property comprises 70 acres of ground on which there is the Arena, an amusement park, and two industrial buildings. The Arena operation is secondary in this acquisition. The Arena has seating capacity of 14,000 or 15,000. It is not profitable. There are not over six boxing shows a year there. The Arena has not more than 30 or 35 dates a year of any kind.

96. For many years prior to April 1949, the Garden had been in effect a partner of the promoter, Michael S. Jacobs, and of his corporation Twentieth Century Sporting Club, Inc. (hereinafter

referred to as Twentieth Century), in the promotion of professional championship, as well as non-title boxing contests, and the Garden had shared in the profits of those promotions on a 50-50 basis.

97. During the period from 1937 to 1949 Jacobs through Twentieth Century promoted professional boxing contests, including a number of championship boxing matches, in the Garden Arena.

98. In 1946 the Garden had extended its existing agreement leasing its arena exclusively to Jacobs and Twentieth Century for boxing contests, and such agreement was effective in accordance with its terms until May 31, 1951.

99. Jacobs in early 1947 suffered a severe illness, and thereafter the Garden's income from boxing declined. Jacobs was unable thereafter to take personal and active charge of the management and direction of Twentieth Century. Jacobs spent much time in Florida in 1948 and in January 1949 cut the salaries of his staff at Twentieth Century.

100. By January 1949, the defendants Wirtz and Norris for many years had, among their varied business enterprises, been engaged in the operation of the following indoor arenas: Chicago Stadium, Detroit Olympia, and St. Louis Arena, all of which were then owned and controlled by them jointly with Norris' father, James Norris. The investments of Wirtz, Norris and Norris' father in these arenas amounted to more than ten million dollars.

101. From time to time, prior to January 1949, corporations owned by Wirtz and Norris had been associated with the promotion of an occasional professional boxing contest for exhibition in one of the said arenas. Prior to January, 1949 Wirtz and Norris had also rented the Chicago Stadium from time to time to persons who wished to promote professional boxing contests. The results of these ventures had not been successful and comparatively few boxing contests had been staged there.

102. In January 1949 and prior thereto, defendants Wirtz and Norris directly and indirectly owned more than 50,000 shares of the stock of Madison Square Garden Corporation.

103. In 1948 Wirtz had been informed that the Columbia Broadcasting System was prepared to lose a substantial sum of money in order to obtain control of boxing television, and Wirtz and Norris were concerned that television companies might control the broadcasting of boxing events to the detriment of the indoor arenas in which they were interested.

104. In and after 1948 Wirtz and Norris were also aware of the increasing difficulties of the Garden, in connection with its boxing events, resulting from the impairment of Jacobs' health.

105. Prior to January 1949, Wirtz and Norris had, on several occasions, proposed in general terms to the Garden management a working program. The Garden management, however, refused to discuss such proposals because of the Garden's long term commitment to Jacobs.

## IX. The Unlawful Combination and Conspiracy.

a. The defendants combine and conspire.

106. In 1948, Joe Louis Barrow (hereafter Joe Louis), was the Heavyweight champion of the world. He began to make plans for his retirement from the field and in this he was counselled and advised by Truman K. Gibson, Jr. and Harry Mendel. It was part of the plan ultimately formulated by Gibson that Louis, on his retirement as Heavyweight champion, should endeavor to obtain a continuing financial interest and source of income by the formation of an organization which would promote future professional championship boxing contests. It was further contemplated that the success and continuity of operation of this organization should be achieved by obtaining exclusive options on the professional championship boxing engagements of all reasonably qualified contenders for the title Louis held. To accomplish this, Gibson and Mendel approached Norris to discuss the matter

generally. At Norris' suggestion, they later met with Wirtz in Chicago. This occurred in January 1949.

107. In about late January of 1949, Wirtz and Norris entered into an agreement with Louis, then Heavyweight Champion of the World, under which—

(a) Joe Louis or his practically wholly-owned company Joe Louis Enterprises, Inc. (hereinafter referred to as Enterprises) agreed to sign the four leading heavyweight contenders to agreements which would vest in Louis, or his assignee, the exclusive right to promote their professional boxing matches, and all radio, television, and motion picture rights to such contracts.

(b) Joe Louis would then resign as Heavyweight Champion.

(c) Joe Louis would assign the four exclusive contracts to a corporation to be. formed by Wirtz and Norris for the purpose of promoting professional boxing matches.

(d) Joe Louis would be employed by this corporation, at a salary of $15,000 a year and would receive $150,000 and part of the stock in the promoting corporation to be formed by Wirtz and Norris, for assigning the exclusive contracts with the said contenders and resigning as Heavyweight Champion.

(e) The said contenders were to engage in contests to determine, with approval of the National Boxing Association, the new Heavyweight Champion.

108. A condition precedent to consummation of this agreement and to the $150,000 obligation of Wirtz and Norris was that the National Boxing Association recognize the winner of the first contest engaged in by the said contenders as the new Heavyweight Champion of the World.

109. In or about February 1949, Enterprises entered into contracts with the four contenders Ezzard Charles, Joe Walcott, Lee Savold and Gus Lesnevich.

110. Each of the four contracts provided, in substance, that the boxer concerned would render services as a professional boxer exclusively to Enterprises or its assignee and would not during the term of the contract engage in any professional boxing contest or boxing exhibition for others without the consent of Enterprises; that, subject to the approval of the boxer concerned or his manager and to the approval of the athletic commission or governing body of boxing of the state, county, city or place where any such boxing contest was held, each opponent of the boxer in all of his contests and exhibitions would be designated by Enterprises or its assignee; that the boxer concerned would receive for his services in each contest engaged in under the agreement a percentage of the gate receipts not less than 25% and not less than 25% of any revenue from the sale of motion picture, radio, or television rights to such contest, if such rights were sold; that Enterprises would stage and conduct all boxing contests and exhibitions in which the boxer concerned should be matched during the term of the agreement, the time and place of each such contest or exhibition to be fixed by Enterprises subject to the approval of the boxer or his manager; that Enterprises guaranteed that the earnings of the boxer concerned during the term of the agreement would be at least $5,000 per year; that Enterprises would have the exclusive radio, television and motion picture rights to all contests of the boxer concerned during the term of the agreement; that the term of each agreement was for a period of two years from February 14, 1949, subject to an option to renew the contract for a period of two years and for further two year periods thereafter on the expiration of that term to which the agreement might be extended; and, the four contracts taken together provided for three specific boxing contests between the four boxers concerned, each boxer agreeing especially to engage in such match and Enterprises agreeing to stage and conduct each such match, provided that each such match should receive the National Boxing Association's designation as a contest for the world heavyweight championship.

111. On March 1, 1949, Joe Louis resigned his title as heavyweight champion of the world, and the National Boxing Association announced that it had approved the plans offered by Louis and had agreed to recognize the winner of the first elimination contest between contenders Charles and Walcott as the new heavyweight champion of the world provided that Savold and Lesnevich should each have an opportunity to fight for the title within a reasonable time thereafter.

112. Wirtz and Norris, as a result of the agreement described in Finding 107 and the execution thereof, caused IBC (Ill.) to be organized on March 1, 1949 for the purpose of promoting professional boxing contests in Illinois.

113. On or about March 24, 1949, Enterprises assigned its exclusive contracts with Charles, Walcott, Savold and Lesnevich to IBC(Ill.) and received, in pursuance of the agreement with Wirtz and Norris $150,000.

114. On March 24, 1949, at a Board of Directors meeting of IBC(Ill.) plans were made for the promotion of championship boxing contests in Michigan and Missouri. Thereafter, on July 12, 1949 Wirtz and Norris caused the formation on the International Boxing Club, Inc., a Michigan corporation, and on October 23, 1950, caused the name of an existing Missouri corporation to be changed to International Boxing Club, Inc., for the purpose of promoting championship boxing contests as well as other boxing contests in those States.

115. In order to promote championship contests in New York, Wirtz and Norris caused the formation of IBC (NY) on March 14, 1949.

116. As the result of the consummation of their agreement with Joe Louis, Norris and Wirtz in March 1949 were in a position to promote boxing contests in which the heavyweight championship title would be at stake.

b. The Garden joins the combination and conspiracy.

117. During a twelve-year period, from 1937 through 1948, about 45% of all championship contests presented in the United States were held in New York City and, of these, about 75% were held in the Garden Arena.

118. The existence and operation in 1948 and through March 1949 of Tournament of Champions, Inc. (a promoter of professional boxing contests of which the Columbia Broadcasting System, an operator of a radio and television network, was part owner) caused Wirtz and Norris to be concerned about CBS obtaining control of championship boxing matches.

119. In 1948 both Wirtz and Norris conferred with John R. Kilpatrick, then president of the Garden, and suggested a joint program between them that would prohibit Columbia Broadcasting System from obtaining control of the promotion of championship boxing contests. A few months thereafter a representative of Wirtz stated to an officer of the Garden that the televising of a championship contest from the Garden in early 1949 had seriously affected attendance at professional boxing contests presented by Wirtz and Norris in their arenas in Chicago and Detroit.

120. Shortly after the arrangements between Wirtz-Norris and Joe Louis were made, Wirtz proposed by letter of March 13, 1949 to the Garden that he and Norris, and the Garden "should work together now and keep the events for our buildings and not create a competitive situation that would be harmful to all."

121. It was arranged that Jacobs should come from Florida to discuss with the Garden management a possible termination of his lease, and on April 5, 1949, the Garden received Jacobs' consent to enter into discussions with Norris and Wirtz.

122. In mid-April 1949, Wirtz and Norris and the Garden negotiated regarding their jointly owning corporations to conduct boxing contests in their respective arenas and outdoors. Thereafter, Wirtz and Norris, and the Garden, on or about May 5, 1949 arrived at an agreement to combine and join forces.

123. Pursuant to this agreement, common boards of directors, consisting

of Wirtz, Norris, Louis, Kilpatrick, and Irish an official of the Garden, were designated for both IBC(NY) and IBC (Ill.). The personnel of these boards of directors remained the same from about July 1949 and thereafter throughout the period covered by the complaint, except that Joe Louis was replaced by Truman K. Gibson, a trustee for his benefit, in about August 1950.

124. Prior to this agreement, Wirtz and Norris, through their promoting corporation IBC(Ill.), were in a position to compete with the Garden in the promotion of championship contests.

125. The terms of this agreement included the following:

(a) Wirtz and Norris would be entitled to 80% of the profits of IBC(Ill.); the Garden would be entitled to 80% of the profits from IBC(NY); and Joe Louis would be entitled to 20% of the profits from each;

(b) Championship contests would be allocated between the IBCs—two-thirds of them to IBC(NY) and one-third to IBC(Ill.); and

(c) Garden would contribute to the venture an amount substantially equal to the payment by Wirtz and Norris of $150,000 to Joe Louis for the assignment of the exclusive contracts which Louis had obtained from Charles and Walcott.

126. A prerequisite to the Garden joining in the agreement with Wirtz and Norris was that it obtain a cancellation of its lease to Jacobs and Twentieth Century, and on May 5, 1949 the Garden entered into an agreement with Jacobs and Twentieth Century, under which it agreed to pay $100,000 to Jacobs or his estate, over a period of five years for the cancellation of the lease held by Jacobs and Twentieth Century on the Garden Arena, which agreement was subsequently formalized on May 27, 1949.

127. One of the purposes of the defendants in the making of these agreements was to acquire and retain for the defendants' joint control of the promotion of championship contests and to exclude others, particularly telecasting companies, from promoting championship contests.

## X. The Conspiracy Afoot.

### a. Elimination of competitors.

128. Aside from any of the defendants, the only significant promoters of professional championship boxing contests in the United States existing in early 1949 were Michael S. Jacobs and a corporation with which he was associated, Twentieth Century; and Tournament of Champions and its wholly-owned subsidiary, Sporting Events, Inc.

### 1. Michael S. Jacobs and Twentieth Century Sporting Club, Inc.

129. In addition to the lease arrangement with the Garden, Jacobs and Twentieth Century in May, 1949 had exclusive leases on the Yankee Stadium and St. Nicholas Arena for the presentation of professional boxing contests. These leases were for terms expiring on December 31, 1950 and September 14, 1949, respectively.

130. Jacobs and Twentieth Century also were parties to a contract for the exclusive services in title contests of the then Welterweight Champion, Ray Robinson.

131. On May 5, 1949, for a consideration of $10,000, Jacobs and Twentieth Century agreed on or before June 1, 1949 to assign to the Garden the exclusive leases for professional boxing in the Yankee Stadium and St. Nicholas Arena, to sell to the Garden his aluminum ring and other equipment for outdoor bouts, and to assign or make available the contract between Jacobs and the Welterweight Champion Robinson, and any other contracts with professional boxers or leases for professional boxing sites as the Garden might request.

132. In this same agreement Jacobs and Twentieth Century agreed that for a period of ten years neither of them would engage in the promotion of any professional boxing matches in the United States, nor at any time thereafter cause or permit or consent to the use of the name of Michael S. Jacobs or Twentieth Century in connection with profes-

sional boxing matches without the written consent of Garden.

133. Jacobs and Twentieth Century were thus eliminated as competitors in the promotion of championship contests. The agreements between the defendant Garden and Jacobs and Twentieth Century were made for the purpose of eliminating competition in the promotion of championship boxing contests and did substantially lessen competition in the promotion of championship boxing contests.

### 2. Tournament of Champions, Inc., Sporting Events, Inc., and Columbia Broadcasting System.

134. Tournament of Champions, Inc., was formed on December 29, 1947, as a New Jersey corporation, and was licensed to promote boxing in New Jersey. In 1948, a New York affiliate of Tournament of Champions, ultimately named Sporting Events, Inc., was licensed to promote boxing matches in New York.

135. TofC promoted two championship contests in New Jersey prior to October 1948 and sold moving picture rights to one of them for $25,000 and to the other for $22,500, and sold radio rights to each for $45,000, but it had lost over $30,000 on these promotions.

136. On November 26, 1948 Columbia Broadcasting System, Inc. (CBS), Management Corporation of America (MCA) and Allied Syndicates, Inc. each invested $25,000 to obtain a 25% stock interest in TofC. Thereafter until May 27, 1949, these three corporations, together with George Kletz, whose stock interest was also 25%, remained the owners of TofC.

137. The principal business and business experience of Kletz had been and remained in plastics manufacturing. The principal business and business experience of CBS had been and remained the operation of a radio and television network. The principal business and business experience of Allied Syndicates had been and remained in the field of public relations.

138. The purpose of Columbia Broadcasting System, in purchasing an interest in the TofC, was to obtain radio and television rights to a series of weekly boxing contests and to good fights including championship contests.

139. On March 15, 1949, TofC obtained an exclusive lease on the Polo Grounds in New York City for the promotion of boxing contests for a term expiring on July 1, 1950.

140. For some months prior to March 15, 1949 the TofC had an agreement with the then Middleweight Champion, Cerdan, giving it the right to promote his next two middleweight championship contests.

141. TofC shortly after March 15, 1949 began negotiations to stage two championship contests at the Polo Grounds during the Summer of 1949. TofC intended that one of these bouts would be between Sugar Ray Robinson, the then welterweight champion, and Kid Gavilan. On April 7, 1949, Kletz secured Robinson's signature to a contract for such a contest although Robinson at that time had an exclusive service contract with Jacobs. Kletz was unable to get Gavilan to agree to this contest and on May 8, he asked Robinson's manager to accept another opponent. Robinson's manager asked that the proposed bout be called off. TofC intended that the other of these bouts would be between Cerdan and Tony Zale, but by May 9, 1949 had been unable to complete arrangements for the bout.

142. Wirtz, Norris and Garden, in April 1949, recognized the threat of Tournament of Champions as a competitor in the promotion of professional championship boxing contests.

143. TofC had sustained increasing financial losses in its operations. By April 7, 1949 MCA had indicated to CBS that it was interested in getting out of TofC. Kletz had earlier indicated his discouragement with the enterprise and had resigned as president and director on January 14, 1949. On April 7, 1949 Lawrence Lowman, the CBS executive closest to the operation of TofC, suggested to the President of CBS that CBS should consider getting out of TofC.

Thereafter, Lowman began negotiations with the Garden looking toward the sale of the assets of TofC.

144. These negotiations were carried on and in accordance with an understanding reached with Wirtz and Norris, on May 27, 1949, the Garden, acting for IBC(NY), purchased from CBS, MCA, Allied Syndicates and Kletz all the stock and certain notes of TofC for $100,000 and 25% of the net profits of the next two middleweight championship contests promoted by the IBCs or those associated with them.

145. In connection with the purchase of TofC, the Garden entered into a separate agreement with CBS in which the Garden agreed that CBS, for a term of 5 years beginning June 1, 1949, should have a right of first refusal of the purchase of radio and television rights to a series of boxing contests to be presented weekly on a night other than Friday from September to May of each year during the term of the agreement and should also have a right of first refusal of the purchase of radio and television rights to 50% of all outdoor boxing contests and indoor boxing contests not presented as part of a weekly series during such term. The Garden was not obligated either to promote any such contests or to sell such rights, and CBS was required to exercise its rights of refusal within a reasonable time after the rights to each annual series or single contest, as the case might be, had been offered to it. In return CBS agreed that it would not, during the five year term of the agreement, invest in any professional boxing matches or in the promotion or staging thereof, or have any proprietary interest therein, except with the Garden's consent. The agreement did not bar CBS from purchasing television or radio rights to boxing contests not promoted by the defendants nor did it require CBS to purchase such rights from the defendants.

146. CBS broadcast an annual series of boxing contests promoted on Wednesday nights by the defendants up to 1955 and at that time CBS discontinued its broadcasting of boxing.

147. The defendants' purchase of TofC's stock and indebtedness from Kletz, CBS, MCA and Allied Syndicates was made with the intent of, and for the purpose of, eliminating competition in the promotion of professional boxing contests and did result in substantial lessening of such competition. As a result of the acquisition of the assets of Tournament of Champions and the procurement of the agreement not to compete from Columbia Broadcasting System, both of them were eliminated as competitors in the promotion of championship contests.

b. Defendants' control of important stadia and arenas.

148. For many years prior to 1949, and during the complaint period defendants Wirtz and Norris were in effect proprietors of and controlled the Chicago Stadium, the St. Louis Arena, and the Detroit Olympia, and defendant Garden owned and controlled Madison Square Garden.

149. One reason which prompted the Garden to join with Wirtz and Norris in promoting boxing contests was the importance of the arenas controlled by Wirtz and Norris.

150. On September 1, 1949, IBC (NY), lessee, and St. Nicholas Sports Center, Inc., lessor, entered into a lease for a term commencing September 15, 1949 and ending September 14, 1950 under which IBC(NY) was granted use of St. Nicholas Arena for at least 42 nights during that year for professional boxing matches and the exclusive right to conduct such matches at the said Arena during the term of lease. In 1950, 1951 and 1952 similar leases for one year terms were thereafter entered into between IBC(NY) and St. Nicholas Sports Center, Inc. for the years 1950–1951, 1951–1952 and 1952–1953.

151. On July 15, 1949, IBC(NY), lessee, and the New York Yankees, Inc., the owners of the Yankee Stadium and National Exhibition Company, the owners of the Polo Grounds, lessors, entered into a lease under which IBC(NY) was licensed to use those arenas for not more than 4 professional boxing matches a

year and was granted the exclusive right to hold boxing matches at those arenas during the term of the lease. The term of the lease commenced January 1, 1950 and ended December 31, 1952.

152. The City of New York has the largest concentration of population in the United States. It is the most important site in the United States for the staging of championship boxing contests.

153. The City of Chicago, Illinois, in which the Chicago Stadium is located, has the second largest concentration of population in the United States and Detroit, Michigan, and St. Louis, Missouri, respective sites of the Detroit Olympia Arena, and the St. Louis Arena, also have large concentrations of population. These arenas are also important sites of championship contests.

154. St. Nicholas Arena is the only indoor arena other than the Garden in New York City which was used for the promotion of a championship boxing contest during the period from 1937–1948.

155. The Yankee Stadium and the Polo Grounds are the most suitable outdoor stadia for the presentation of professional championship boxing in the United States.

156. Fifty percent of all championship contests held in the United States from 1937 to 1948, inclusive, were held in the Garden Arena, Yankee Stadium, Polo Grounds, St. Nicholas Arena, Chicago Stadium, Detroit Olympia, and St. Louis Arena.

157. During the period from January 1, 1937 to 1948, inclusive, forty-five percent of all of the championship contests presented in the United States were held in New York City, and, of these, seventy-five percent of them were held in the Garden Arena. Of the remaining bouts held in New York City, all were held at the Yankee Stadium, St. Nicholas Arena, and Polo Grounds, with but a single exception.

158. Beginning in about May 1949 and continuing throughout the period covered by the Complaint, the defendants had control of the Garden Arena, Yankee Stadium, Polo Grounds, St. Nicholas Arena, the Chicago Stadium, the Detroit Olympia, and the St. Louis Arena, which are key stadia and arenas for the presentation of championship boxing contests in the United States.

159. The defendants in March 1949 considered that the pooling of these stadia and arenas would be instrumental and effective in excluding other promoters from the promotion of championship contests.

160. As a result of the control exercised by the defendants over their own arenas and the exclusive leases of other arenas and stadia, all other promoters have been excluded from promoting championship boxing contests in said arenas and stadia during the period June 1949 through May 15, 1953.

c. Defendants' exclusive contracts with contenders for championship.

161. A term of the agreement between defendants was that they would require from each contender in a championship contest, over which defendants had promotional control or had an exclusive contract with the existing champion, a contract providing that, if he won and thereby became champion, he would engage in championship contests for a period of three, or sometimes five, years, solely under the promotion of one of the defendant IBCs or its designees. This term of the agreement between defendants was effectuated and consistently followed by them in the vast majority of instances.

162. The contingent, exclusive contracts between the defendants and a contender provided that if he won a championship title in a specific contest which IBC(NY) or IBC(Ill.) planned to promote or to have promoted between such contender and the champion, the contender would be employed exclusively by the defendants in all his matches, or in all matches in defense of his title, for a period of 3 years. Subject to the approval of the boxer and his manager and to that of the local boxing commission concerned, the employer was to select the boxer's opponents. The right to dispose

of radio, television and motion picture rights was given exclusively to the defendants. A minimum annual compensation was guaranteed to the boxer.

163. These contracts were obtained by defendants from the contender as a condition precedent to such contender having the opportunity to win a title by engaging in a championship contest.

164. The defendants' practice of so obtaining such contingent, exclusive contracts from the contenders served as a device for perpetuating their control of professional world championship contests as the title passed from one boxer to another.

165. From time to time, IBC(NY) and IBC(Ill.) have made advances and loans to professional boxers and their managers. Such advances and loans outstanding at any one time have amounted to approximately $39,000 for IBC(NY) and about the same amount for IBC (Ill.). Such advances and loans are sought by the boxers and managers to meet financial emergencies, to pay taxes and hospital bills, to pay training expenses in advance of boxing contests and for related purposes, and they are made by the defendants.

166. There is no evidence that such advances or loans were used by the defendants to exert economic pressure on any boxer or manager.

## XI. The Results of Defendants' Conspiracy.

167. The intent of the defendants and the necessary result of their activities during the period covered by the Complaint as set forth in these Findings, including their acquisition of the contracts with the four heavyweight contenders from Joe Louis; their elimination from the promotion of championship contests of Jacobs, Twentieth Century, Tournament of Champions and Columbia Broadcasting System; their control of key stadia and arenas for the presentation of boxing contests and their procurement of the exclusive contracts with champions and contenders in championship contests, was to combine in order to obtain control of, and exclude others from, the promotion of championship boxing contests in the United States.

168. The defendants, as a result of their activities acquired power, during the period covered by the Complaint, to exclude competitors from the promotion of championship contests in the United States.

169. Beginning June 16, 1949, the date of the first championship contest promoted by defendants through May 15, 1953, the end of the period covered by the complaint, there were 44 professional championship boxing contests promoted in the United States. The defendants promoted 25 of the said 44 professional world's championship bouts.

170. As to 11 of the other 19 championship contests, viz.:

Charles-Valentino of October 1949
Charles-Beshore of August 1950
Charles-Barone of December 1950
Walcott-Charles of July 1951
Carter-Aragon of November 1951
Gavilan-Dykes of February 1952
Salas-Carter of May 1952
Walcott-Charles of June 1952
Gavilan-Turner of July 1952
Marciano-Walcott of September 1952
Carter-Collins of April 1953

one of the defendants had an agreement in effect at the time of each such contest with the Champion involved, which required the Champion to engage in world championship contests only under the promotion of a defendant or its designee.

171. As to each championship contest referred to in Finding 170, the contender, prior to engaging in such contest, executed an agreement which provided that if he won, and thereby became Champion, he would engage in world championship contests only under the promotion of a defendant or its designee.

172. One or more of the defendants received revenue from the promotion of all but one of the contests referred to in Finding 170. As to this single exception, the defendant IBC(NY) permitted another promoter, Dewey Michaels of

Buffalo, New York, to promote the contest on the condition, however, that the said Michaels pay 5% of all monies received from the sale of tickets, and radio, television, and motion picture rights, if any, to IBC(NY), and this defendant made a strong effort to collect the said 5%. Because of the refusal of the said promoter Michaels to pay 5% of all monies received to IBC(NY), this defendant threatened not to permit Michaels to promote any other contest over which it had promotional control.

173. One or more of the defendants had control of the promotion of each of the eleven championship contests referred to in Finding 170.

174. Of the 44 professional championship contests presented in the United States between June 16, 1949, the date of the first championship contest promoted by defendants, and May 15, 1953, the defendants promoted, or controlled the promotion of 36, or approximately 81% of them.

175. The defendants exercised this promotional control by either promoting the contests themselves or by permitting another promoter to do so in consideration of one or more of the defendants receiving part of the revenue from the promotion of such contests.

176. From January 1951, eighteen months after the defendants promoted their first championship contest, to May 15, 1953, the end of the period covered by the Complaint, 27 championship contests were presented in the United States, and as to 25 of such contests, or about 93% of them, the defendants controlled the promotion of them, and either promoted or participated in the revenues from the promotion of them.

177. The defendants did by their concert of action and agreement intend to, and did in fact exclude others from the promotion of, exhibition of, or sale of television, radio and motion picture rights to, professional championship boxing contests.

■ 178. The defendants did combine and conspire to acquire and secure unto themselves the power to exclude others from the promotion of, exhibition of, or sale of television, radio and motion picture rights to, professional championship boxing contests.

179. The contracts, agreements, and understandings of and between the defendants with respect to the promotion, exhibition or sale of television, radio, and motion picture rights to championship boxing contests have unreasonably restrained trade or commerce.

With these findings made, we come to consideration of the Conclusions of Law to be drawn from them.

## 3.

### THE LAW APPLICABLE TO THE FINDINGS OF FACT

The defendants argue that (1) the promotion of championship boxing contests does not constitute the "relevant market" for purposes of determining monopoly power; (2) they have not in fact combined and conspired in restraint of or to monopolize, trade in violation of Sections 1 and 2 of the Sherman Act; and (3) their activities are not in interstate trade or commerce.

■ Defendants' first point relating to the relevant market is predicated almost exclusively on the recent decision in United States v. E. I. DuPont de Nemours and Company—the so-called Cellophane case—351 U.S. 377, 76 S.Ct. 994, 1004, 100 L.Ed. 1264. That case is the Supreme Court's latest exposition on the subject of the relevant market for Sherman Act consideration. Although the prevailing opinion did not command the assent of a majority of the Court (it being divided 4–3, with two Justices not participating), nevertheless, it is the precedent upon which both sides in this case have relied.

In the Cellophane case, the Court, following earlier precedents, ruled that:

"a party has monopoly power if it has, over 'any part of the trade or commerce among the several states', a power of controlling prices or un-

reasonably restricting competition. * * * Monopoly power is the power to control prices or exclude competition."

The Supreme Court made clear that *price* and *competition* both must be considered in finding monopoly power. However, the "relevant market" for monopoly power considerations

"will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered."

This determination, as the Court points out, is basically a factual one, which is resolved by the "varying circumstances of each case." In DuPont, the Supreme Court found the defendant's factual argument sustained by the evidence; here we do not.

Cellophane was proved to be but a part of the market for flexible package materials which included other products that had *reasonable interchangeability* for the purposes for which they were produced. The question here comes down to this: Do non-championship boxing bouts, in their promotion and exhibition, including the sale of tickets, television rights, movie rights, radio rights, have a reasonable interchangeability with championship boxing contests both as a financial proposition and as an entertainment media? Based upon the factual findings we have made in this case, it is established that this query must be answered in the negative.

The defendants themselves by concentrating their activities in the sphere of championship fights have recognized the unique qualities of these bouts which generate a special demand for them by boxing enthusiasts. A world championship in any of the recognized classifications is clearly the peak sought by the many boxers in each class. When attained, the champion has an asset which gives him not only the epitome of prestige, but also a most lucrative future so long as he wears the championship crown.

In matters of public appeal as well as financial return, championship contests are on a plane which clearly distinguishes them from non-championship fights. The great public interest in a championship match was shown to generate a separate and distinct public demand which attracts many spectators who do not patronize non-championship fights.

Defendants do not seriously challenge the financial facts adduced by the Government. The average gross revenue of a championship fight promoted by defendants was almost four times that of an ordinary fight. Breaking down these overall figures, it appears that a championship contest generates three times the television, radio and movie revenues, and five times the box office receipts of non-championship fights.

Qualitatively, a championship boxing bout is so different from a non-championship fight as to establish an identity of the one distinguished from the other. Defendants themselves demonstrated their awareness of this by exacting their contingent exclusive contracts from championship contenders limited to future championship fights. Similarly, championship bouts were treated as outside the agreements with television sponsors for the regular weekly fight series. Indeed, the substantially higher prices paid by such sponsors and broadcasters for the right to broadcast or televise a championship bout is manifest evidence of their special audience appeal, and serves to explain why defendants concentrated their activities in this sphere.

The Court concludes that the promotion of championship boxing contests does constitute a distinct, unique and relevant market for Sherman Act consideration.

The second point urged by defendants is strictly a factual argument to the effect that they have not combined or conspired in restraint of or to monopolize trade or commerce. Having found the factual allegations of the complaint sus-

tained by the proof submitted on trial, more need not be said here except to observe that the Supreme Court in this case has stated:

"And the defendants do not deny that the allegations state a cause of action if their business is subject to the Sherman Act." United States v. International Boxing Club of New York, Inc., 348 U.S. 236, at page 240, 75 S.Ct. 259, 261, 99 L.Ed. 290.

We turn, then, to defendants' final argument that their activities were not engaged in interstate trade or commerce. Based on my factual findings, this contention has been answered with finality by the Supreme Court.

■ While the business of staging and promoting these championship boxing contests may formerly have been "purely local affairs", Federal Base Ball Club of Baltimore v. National League, 1921, 259 U.S. 200, 208, 42 S.Ct. 465, 66 L.Ed. 898, modern management has made them vehicles by which television and radio programs may be broadcast and advertising presented with an attractive nationwide appeal. The Government has established, and I have found, that the promotion of professional championship boxing contests was had by the defendants on a multi-state basis, and that it was coupled with the sale of rights to televise, broadcast and film the contests for interstate transmission. This, the Supreme Court has held, "constitutes 'trade or commerce among the several States' within the meaning of the Sherman Act", United States v. International Boxing Club of New York, Inc., 348 U.S. 236, 240, 75 S.Ct. 259, 261. More recently, the Supreme Court in Radovich v. National Football League, 77 S.Ct. 390, 394, had occasion to say:

"We did not extend them [the baseball decisions] to boxing or the theatre because we believed that the volume of interstate business in each—the rationale of Federal Base Ball—was such that both activities were within the Act."

My factual findings here justify and sustain this view.

· Defendants seek refuge in the argument that the "far-reaching implications of this case * * * may well be the opening skirmish of a broad attack upon all professional sports, except organized baseball." The answer to this is twofold: (1) the promotion of professional championship boxing contests is a pure and simple money-making, profit-seeking business, and (2) the Supreme Court, in the so-called "baseball cases," has never held "that all businesses based on professional sports are outside the scope of the anti-trust laws." United States v. International Boxing Club of New York, Inc., supra. The Supreme Court went on to say:

"it would be sufficient, we believe, to rest on the allegation that over 25% of the revenue from championship boxing is derived from interstate operations through the sale of radio, television, and motion picture rights."

As I have found in the factual findings, the Government has sustained the allegations of the complaint relating to the sale of radio, television and motion picture rights to championship boxing fights. This, the Supreme Court has held, without considering their many other interstate aspects, is sufficient to bring the business of promoting championship boxing contests within the Sherman Act's trade and commerce concept.

### 4.
### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the defendants.

2. Beginning sometime in 1949 and continuing thereafter, the defendants have been engaged in a combination and conspiracy in unreasonable restraint of trade and commerce in the promotion of professional world championship boxing contests among the several states of the United States, and were parties to contracts, agreements, arrangements, and understandings in unreasonable restraint of such trade and commerce, all in violation of Section 1 of the Sherman Act,

3. Beginning sometime in 1949 and continuously thereafter, the defendants have been engaged in a combination and conspiracy to monopolize trade and commerce in the promotion of professional world championship boxing contests among the several states of the United States in violation of Section 2 of the Sherman Act.

4. Beginning sometime in 1949 and continuing thereafter, the defendants have been monopolizing trade and commerce in the promotion of professional world championship boxing contests among the several states of the United States in violation of Section 2 of the Sherman Act.

5. The plaintiff is entitled to relief by appropriate decree of this Court.

Proposed decrees may be filed within thirty days from date of the filing of this opinion and thereafter all will be heard on due notice.