# UNITED STATES *v.* INTERNATIONAL BOXING CLUB OF NEW YORK, INC. ET AL.

No. 53. Argued November 10, 1954.—Decided January 31, 1955.

*Philip Elman* argued the cause for the United States. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Barnes* and *Daniel M. Friedman.*

*Manuel Lee Robbins,* Special Assistant Attorney General of New York, argued the cause for the New York State Athletic Commission, as *amicus curiae,* urging reversal. With him on the brief was *Nathaniel L. Goldstein,* Attorney General, for the State of New York and the New York State Athletic Commission, as *amici curiae.*

*Whitney North Seymour* and *Charles H. Watson* argued the cause for appellees. On the brief were *Mr. Seymour, Benjamin C. Milner* and *Armand F. Macmanus* for the International Boxing Club of New York, Inc. et al., and *Mr. Watson* for the International Boxing Club, Inc. et al., appellees.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This is a civil antitrust action brought by the Government in the United States District Court for the Southern District of New York. The defendants—three corporations and two individuals—are engaged in the business of promoting professional championship boxing contests.[1] The Government's complaint charges that the defendants, in the course of this business, have violated §§ 1 and 2

---

[1] The corporate defendants are International Boxing Club of New York, Inc., International Boxing Club, and Madison Square Garden Corporation. The individual defendants are James D. Norris and Arthur M. Wirtz. The individual defendants, together with Madison Square Garden Corporation, own 80% of the stock of International Boxing Club of New York, Inc., and International Boxing Club. The nature of the business involved is described in an appendix to this opinion.

of the Sherman Act.[2] After this Court's decision in *Toolson* v. *New York Yankees,* 346 U. S. 356, the defendants moved to dismiss the complaint. The District Court granted the motion in reliance upon the *Toolson* decision and *Federal Baseball Club of Baltimore* v. *National League of Professional Baseball Clubs,* 259 U. S. 200.[3] The case, together with *United States* v. *Shubert, ante,* p. 222, is here on direct appeal under the Expediting Act, 15 U. S. C. § 29.

The Government's complaint alleges that promoters of professional championship boxing contests

> "make a substantial utilization of the channels of interstate trade and commerce to:
>
> "(a) negotiate contracts with boxers, advertising agencies, seconds, referees, judges, announcers, and other personnel living in states other than those in which the promoters reside;
>
> "(b) arrange and maintain training quarters in states other than those in which the promoters reside;

---

[2] 15 U. S. C. §§ 1 and 2. These sections provide:

"§ 1. . . . Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . . Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor . . . .

"§ 2. . . . Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . ."

Section 4 confers jurisdiction on the district courts "to prevent and restrain violations of sections 1–7 of this title" in equity proceedings instituted under the direction of the Attorney General.

[3] The District Court's opinion was oral and not transcribed. All the parties agree, however, that the dismissal was based on *Federal Baseball* and *Toolson.*

"(c) lease suitable arenas, and arrange other details for boxing contests, particularly when the contests are held in states other than those in which the promoters reside;

"(d) sell tickets to contests across state lines;

"(e) negotiate for the sale of and sell rights to make and distribute motion pictures of boxing contests to the 18,000 theatres in the United States;

"(f) negotiate for the sale of and sell rights to broadcast and telecast boxing contests to homes through more than 3,000 radio stations and 100 television stations in the United States; and

"(g) negotiate for the sale of and sell rights to telecast boxing contests to some 200 motion picture theatres in various states of the United States for display by large-screen television."

The promoter's receipts from the sale of television, radio, and motion picture rights to championship matches, according to the complaint, represent on the average over 25% of the promoter's total revenue and in some instances exceed the revenue derived from the sale of admission tickets.[4] The complaint alleges that the defendants have restrained and monopolized this trade and commerce— "the promotion, exhibition, broadcasting, telecasting, and motion picture production and distribution of professional championship boxing contests in the United States"— through a conspiracy to exclude competition in their line of business. The conspiracy, it is claimed, began in 1949 with an agreement among the defendants and Joe Louis, then heavyweight champion of the world, that Louis would resign his title, that he would procure exclusive

---

[4] The complaint further alleges that "With the progressive and continuing expansion of television facilities, the proportion of the promoter's total revenue derived from television, radio and motion pictures, has been on an ascending curve . . . ."

rights to the services of the four leading title contenders in a series of elimination contests which would result in the recognition of a new heavyweight champion, that he would also obtain exclusive rights to broadcast, televise, and film these contests, and that he would assign all such exclusive rights to the defendants. The defendants have allegedly sought to maintain and effectuate this conspiracy by the following means: by eliminating the "leading competing promoter" of championship matches; by acquiring the exclusive right to promote professional boxing contests in all the "principal arenas" where championship matches can be successfully presented; and by requiring each title contender to agree, as a condition of fighting for the championship, that if he wins he would, for a period of three (and sometimes five) years, take part only in title contests promoted by the defendants. As a consequence of these acts, the complaint alleges, the defendants have promoted, or participated in the promotion of, all but two of the 21 championship matches held in the United States between June 1949 and the filing of the complaint in March 1952.

These allegations must of course be taken as true at this stage of the proceeding. And the defendants do not deny that the allegations state a cause of action if their business is subject to the Sherman Act. The question thus presented is whether the defendants' business as described in the complaint—the promotion of professional championship boxing contests on a multistate basis, coupled with the sale of rights to televise, broadcast, and film the contests for interstate transmission—constitutes "trade or commerce among the several States" within the meaning of the Sherman Act.

The question is perhaps a novel one in that this Court has never before considered the antitrust status of the boxing business. Yet, if it were not for *Federal Baseball* and *Toolson,* we think that it would be too clear for dis-

pute that the Government's allegations bring the defend-
ants within the scope of the Act. A boxing match—like
the showing of a motion picture (*United States* v. *Cres-
cent Amusement Co.,* 323 U. S. 173, 183) or the perform-
ance of a vaudeville act (*Hart* v. *B. F. Keith Vaudeville
Exchange,* 262 U. S. 271) or the performance of a legit-
imate stage attraction (*United States* v. *Shubert, ante,*
p. 222)—"is of course a local affair." But that fact alone
does not bar application of the Sherman Act to a business
based on the promotion of such matches, if the business
is itself engaged in interstate commerce or if the business
imposes illegal restraints on interstate commerce. Apart
from *Federal Baseball* and *Toolson,* it would be sufficient,
we believe, to rest on the allegation that over 25% of the
revenue from championship boxing is derived from inter-
state operations through the sale of radio, television, and
motion picture rights.[5] Compare *United States* v. *Yellow
Cab Co.,* 332 U. S. 218, 225–226; *Times-Picayune Co.* v.
*United States,* 345 U. S. 594, 602, n. 11; *Mandeville Island
Farms* v. *American Crystal Sugar Co.,* 334 U. S. 219, 227–
235; *United States* v. *Frankfort Distilleries,* 324 U. S.
293, 297–298; *United States* v. *Women's Sportswear
Mfrs. Assn.,* 336 U. S. 460, 464; *United States* v. *Employ-
ing Plasterers Assn.,* 347 U. S. 186, 189; and cases collected
in the *Shubert* opinion. See also *Currin* v. *Wallace,* 306
U. S. 1, 10; *Wickard* v. *Filburn,* 317 U. S. 111, 127–128.

Notwithstanding these decisions, the defendants con-
tend that they are exempt from the Sherman Act under
the rule of *stare decisis.* They, like the defendants in the
*Shubert* case, base this contention on *Federal Baseball*
and *Toolson.* But they would be content with a more

---

[5] All three media are concededly engaged in interstate commerce.
*E. g., Federal Radio Comm'n* v. *Nelson Bros. Co.,* 289 U. S. 266, 279
(radio); *Dumont Laboratories* v. *Carroll,* 184 F. 2d 153, 154 (C. A.
3d Cir.), cert. denied, 340 U. S. 929 (television); *United States* v.
*Paramount Pictures,* 334 U. S. 131 (motion pictures).

restrictive interpretation of *Federal Baseball* and *Toolson* than the defendants in the *Shubert* case. The *Shubert* defendants argue that *Federal Baseball* and *Toolson* immunized all businesses built around the live presentation of local exhibitions. The defendants in the instant case argue that *Federal Baseball* and *Toolson* immunized only such businesses as involve exhibitions of an athletic nature. We cannot accept either argument.

For the reasons stated in the *Toolson* opinion and restated in *United States* v. *Shubert, ante,* p. 222, *Toolson* neither overruled *Federal Baseball* nor necessarily reaffirmed all that was said in *Federal Baseball.* Instead, "[w]ithout re-examination of the underlying issues," the Court adhered to *Federal Baseball* "so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." 346 U. S., at 357. We have held today in the *Shubert* case that *Toolson* is not authority for exempting other businesses merely because of the circumstance that they are also based on the performance of local exhibitions. That ruling is fully applicable here.

Moreover, none of the factors underlying the *Toolson* decision are present in the instant case. At the time the Government's complaint was filed, no court had ever held that the boxing business was not subject to the antitrust laws.[6] Indeed, this Court's decision in the *Hart* case, less than a year after the *Federal Baseball* decision, clearly established that *Federal Baseball* could not be relied upon as a basis of exemption for other segments of the entertainment business, athletic or otherwise. Surely there is

---

[6] *Shall* v. *Henry,* 211 F. 2d 226 (C. A. 7th Cir.), was decided subsequent to the decision below. So also was *Peller* v. *International Boxing Club,* unreported, Civil 52 C 813, April 23, 1954 (D. C. N. D. Ill.). The unreported decision (D. C. N. D. Ill.) which *Shall* v. *Henry* affirmed was decided prior to the decision below but after the filing of the Government's complaint.

nothing in the Holmes opinion in the *Hart* case to suggest, even remotely, that the Court was drawing a line between athletic and nonathletic entertainment. Nor do we see the relevance of such a distinction for the purpose of determining what constitutes "trade or commerce among the several States." The controlling consideration in *Federal Baseball* and *Hart* was, instead, a very practical one—the degree of interstate activity involved in the particular business under review. It follows that *stare decisis* cannot help the defendants here; for, contrary to their argument, *Federal Baseball* did not hold that all businesses based on professional sports were outside the scope of the antitrust laws. The issue confronting us is, therefore, not whether a previously granted exemption should continue, but whether an exemption should be granted in the first instance. And that issue is for Congress to resolve, not this Court. See *United States v. South-Eastern Underwriters Assn.*, 322 U. S. 533, 561.

The issue was, in fact, before Congress only recently. In 1951, four identical bills were introduced in Congress— three in the House and one in the Senate—forbidding the application of the antitrust laws "to organized professional sports enterprises or to acts in the conduct of such enterprises." [7] Extensive hearings on the three House bills were conducted by the Subcommittee on Study of Monopoly Power of the Committee on the Judiciary; no hearings were held on the Senate bill. [8] At the conclusion

---

[7] H. R. 4229, 4230, 4231, and S. 1526, 82d Cong., 1st Sess. These bills were introduced "by friends of baseball because they feared that the continued existence of organized baseball as America's national pastime was in substantial danger by the threat of impending litigation." H. R. Rep. No. 2002, 82d Cong., 2d Sess., p. 1.

[8] The House hearings were stated to be on "the problem of whether or not organized baseball should be exempted from the operation of the antitrust laws." Hearings on "Organized Baseball" before the House Subcommittee on Study of Monopoly Power of the Committee on the Judiciary, 82d Cong., 1st Sess., p. 1.

of its hearings, the House Subcommittee unanimously declared its opposition to the four bills. Its report states: [9]

"The requested exemption would extend to all professional sports enterprises and to all acts in the conduct of such enterprises. The law would no longer require competition in any facet of business activity of any sport enterprise. Thus *the sale of radio and television rights, the management of stadia,* the purchase and sale of advertising, the concession industry, and many other business activities, as well as the aspects of baseball which are solely related to the promotion of competition on the playing field, would be immune and untouchable. *Such a broad exemption could not be granted without substantially repealing the antitrust laws."* (Italics added.)

With respect to baseball, the Subcommittee recommended a postponement of any legislation until the status of *Federal Baseball* was clarified in the courts.[10] No further action was taken on any of the bills; Congress thus left intact the then-existing coverage of the antitrust laws. Yet the defendants in the instant case are now asking this Court for precisely the same exemption which enactment of those bills would have afforded. Their remedy, if they are entitled to one, lies in further resort to Congress, as we have already stated. For we agree that "Such a broad exemption could not be granted without substantially repealing the antitrust laws."

As in the *Shubert* case, we are concerned here only with the sufficiency of the Government's complaint. We hold

---

[9] H. R. Rep. No. 2002 (entitled "Organized Baseball"), 82d Cong., 2d Sess., p. 230. Between the hearings and the report, the Subcommittee on Study of Monopoly Power was reconstituted as the Antitrust Subcommittee. The report was submitted directly to the full House pursuant to H. Res. 95, 82d Cong., 1st Sess.

[10] *Id.,* at 134–136, 231–232.

that the complaint states a cause of action and that the Government is entitled to an opportunity to prove its allegations. The judgment of the court below is

*Reversed.*

Mr. Justice Burton, retaining the views expressed in his dissent in the *Toolson* case, 346 U. S. 356, 357, joins the opinion and judgment of the Court in this case. Mr. Justice Reed joins in this concurrence.

[For dissenting opinion of Mr. Justice Frankfurter, joined by Mr. Justice Minton, see *post,* p. 248.]

[For dissenting opinion of Mr. Justice Minton, see *post,* p. 251.]

## APPENDIX TO OPINION OF THE COURT.

The complaint describes the "Nature of Trade and Commerce Involved" as follows:

10. Boxers usually compete in amateur tournaments as a preliminary to becoming professionals. As amateurs they receive no pay and box under the sponsorship of local independent boxing clubs, associations or other organizations. When they become professionals, they contract to box an opponent on a per bout basis for local promoters and receive a fee. If their skill as professional boxers results in an increasing willingness of the public to pay to view their contests, they can demand higher fees and a greater percentage of receipts from the sale of tickets and other rights. If their skill increases, they engage in preliminary and other bouts throughout the United States and eventually participate in major bouts. The fee for a major bout is usually a sum guaranteed by the promoter or a predetermined percentage of the net receipts from the sale of tickets and motion picture, radio and television rights.

11. The most lucrative asset to a professional boxer is recognition and designation by the various state athletic

commissions and others as "world champion" in the division in which he competes. These divisions are:

| | | |
|---|---|---|
| flyweight | 112 | lbs. |
| bantamweight | 118 | " |
| featherweight | 126 | " |
| lightweight | 135 | " |
| welterweight | 147 | " |
| middleweight | 160 | " |
| light heavyweight | 175 | " |
| heavyweight | All above 175 lbs. | |

A "world champion" gains his title by defeating the existing champion or by eliminating all contenders, and remains world champion in his division until he is, in turn, defeated by a contender or resigns the title. Such a title affords to its holder financial returns from personal appearances and exhibitions throughout the United States, from endorsements and other activities, as well as a greater percentage of the receipts from his bouts. The promotion of professional championship boxing contests is also more lucrative than the promotion of other boxing contests.

12. Of the various "world championships," the heavyweight division is the most important to boxers and promoters, as it returns the greatest financial benefits. The flyweight and bantamweight divisions are not of substantial importance in the United States because very few American boxers are of such light weights. No championship contest has been held in the flyweight division in the United States since 1935; none in the bantamweight division since 1947.

13. The promotion of professional championship boxing contests, in which the winners achieve "world champion" titles, includes negotiating and executing contracts with boxers for the main and preliminary bouts, arranging and maintaining training quarters, leasing suitable arenas, such as stadia or ball parks where substantial numbers of the public may be seated to view the contest, negotiating and executing contracts for the employment of matchmakers, advertising agencies, press agents, seconds, referees, judges, announcers and other personnel; organizing, assembling, and arranging other details necessary to the

exhibition of the contests; selling tickets and rights to make motion pictures of the contests and to distribute them throughout the United States and in foreign countries; and selling rights to transmit the contests by radio or television throughout the United States and foreign countries.

14. Promoters of professional championship boxing contests make a substantial utilization of the channels of interstate trade and commerce to:

(a) negotiate contracts with boxers, advertising agencies, seconds, referees, judges, announcers, and other personnel living in states other than those in which the promoters reside;

(b) arrange and maintain training quarters in states other than those in which the promoters reside;

(c) lease suitable arenas, and arrange other details for boxing contests, particularly when the contests are held in states other than those in which the promoters reside;

(d) sell tickets to contests across state lines;

(e) negotiate for the sale of and sell rights to make and distribute motion pictures of boxing contests to the 18,000 theatres in the United States;

(f) negotiate for the sale of and sell rights to broadcast and telecast boxing contests to homes through more than 3,000 radio stations and 100 television stations in the United States; and

(g) negotiate for the sale of and sell rights to telecast boxing contests to some 200 motion picture theatres in various states of the United States for display by large-screen television.

15. Motion picture films of professional championship boxing contests are distributed and exhibited in theatres throughout the United States and in foreign countries. Similarly, radio and television broadcasts of such contests are transmitted throughout the United States and radio broadcasts of them are also transmitted to foreign countries.

16. The 21 major professional championship boxing contests promoted in the United States since June 1949

have produced a gross income from admissions and the sale of motion picture, radio and television rights of approximately $4,500,000.00. The total such gross income for all professional boxing contests in the United States during this period, including the championship contests, has been approximately $15,000,000.00.

16 (a). A promoter of a professional championship fight usually derives substantially all of his revenue from two sources: (a) sale of tickets of admission and (b) sale of rights to telecast, broadcast and produce and distribute motion pictures of the fight. In such fights, sale of television, radio and motion picture rights account for a substantial proportion of the promoter's total revenue. Since 1949 sale of these rights has represented, on the average, over 25% of the total revenue derived from championship fights, and has exceeded, in some instances, the revenue received from sale of tickets of admission. With the progressive and continuing expansion of television facilities, the proportion of the promoter's total revenue derived from television, radio and motion pictures, has been on an ascending curve, in relation to revenue derived from sale of tickets of admission. In the Marciano-Walcott heavyweight championship fight of May 15, 1953, at Chicago, Illinois, promoted by defendants IBC (N. Y.), IBC (Ill.), James D. Norris and Arthur M. Wirtz, the promoters' receipts from sale of tickets of admission were, after federal admission taxes, $253,462.37, while their television, radio and motion picture revenue was approximately $300,000.

MR. JUSTICE FRANKFURTER, with whom MR. JUSTICE MINTON joins, dissenting.

It would baffle the subtlest ingenuity to find a single differentiating factor between other sporting exhibitions, whether boxing or football or tennis, and baseball insofar as the conduct of the sport is relevant to the criteria or considerations by which the Sherman Law becomes applicable to a "trade or commerce." § 1, 26 Stat. 209, 15 U. S. C. § 1. Indeed, the interstate aspects of baseball

and the extent of the exploitation of baseball through mass media are far more extensive than is true of boxing.* If the intrinsic applicability of the Sherman Law were the issue, no attempt would be made to differentiate the two sports.

In 1922, the Court found commercialized baseball outside the scope of the Sherman Law. *Federal Baseball Club* v. *National League,* 259 U. S. 200. Last Term the Court refused to re-examine "the underlying issues" of this adjudication and adhered to it. *Toolson* v. *New York Yankees, Inc.,* 346 U. S. 356. What were the "underlying issues"? They were the constituents of baseball in relation to the Sherman Law. By adhering to that decision, the Court refused to depart from a judgment necessarily based on these constituent elements. To my understanding, that is what is meant by "[w]ithout re-examination of the underlying issues." The Court decided as it did in the *Toolson* case as an application of the doctrine of *stare decisis.* That doctrine is not, to be sure, an imprisonment of reason. But neither is it a whimsy. It can hardly be that this Court gave a preferred position to baseball because it is the great American sport. I do not suppose that the Court would treat the national anthem differently from other songs if the nature of a song became relevant to adjudication. If *stare decisis* be one aspect of law, as it is, to disregard it in identic situations is mere caprice.

Congress, on the other hand, may yield to sentiment and be capricious, subject only to due process. As a matter of fact, one of the explicit factors that led to the result in *Toolson* was the recognition of congressional refusal to up-

---

*This opinion is concerned only with the sport as such, and not with the arrangements by which mass media show or report bouts. Such arrangements clearly are beyond the scope of the *Toolson* case, *infra.*

250

set the *Federal Baseball* decision. But as the Government with commendable candor recognizes, Congress was not asked to avert the threat of litigation against baseball by providing a specific exemption of that sport from the provisions of the Sherman Law. The sponsors of this relief did not ask immunity for baseball as such. The "legislation" to which reference was made in the *Toolson* case consisted of bills which sought exemption for "organized professional sports enterprises [and] acts in the conduct of such enterprises." (H. R. 4229, 4230, 4231, and S. 1526, 82d Cong., 1st Sess.) Since, in the light of all the circumstances, *Federal Baseball* was left undisturbed by *Toolson,* I cannot bring myself to construe the respect that was thus accorded to *stare decisis* to be narrower than that all situations identic with what was passed on in the *Federal Baseball* case should be covered by it. I cannot translate even the narrowest conception of *stare decisis* into the equivalent of writing into the Sherman Law an exemption of baseball to the exclusion of every other sport different not one legal jot or tittle from it.

Between them, this case and *Shubert* illustrate that nice but rational distinctions are inevitable in adjudication. I agree with the Court's opinion in *Shubert* for precisely the reason that constrains me to dissent in this case. Within a year after *Federal Baseball* the Court, again unanimously and through the same writer, found that a bill against the show business based on the Sherman Law was not so frivolous as to call for dismissal. *Hart* v. *B. F. Keith Vaudeville Exchange,* 262 U. S. 271. For more than 30 years, therefore, these two decisions stood as the law. The *Shubert* case plainly falls within the adjudication of *Hart.* By the same process of reasoning, boxing falls within *Federal Baseball,* which this Court revitalized in *Toolson* despite all the new factors on which the dissent in *Toolson* relied.

Whatever unsavory elements there be in boxing con- tests is quite beside the mark. The States to which these exhibitions are distasteful are possessed of the honorable and effective remedy of self-help. They need not sanction pugilistic exhibitions, or may sanction them only under conditions that safeguard their notions of the public welfare.

MR. JUSTICE MINTON, dissenting.

To make a case under the Sherman Act, two things among others are essential: (1) there must be trade or commerce; (2) such trade or commerce must be among the States.

In the *Federal Baseball* case, 259 U. S. 200, this Court held that baseball was not trade or commerce. It said, "personal effort, not related to production, is not a subject of commerce," and since the baseball game was an exhibition wholly intrastate, there could be no trade or commerce among the States. 259 U. S. 200, 209.

In the *Baseball* case, this Court held that traveling from State to State to play the game and all the details of arrangements were incident to the exhibition. In *Toolson* v. *New York Yankees*, 346 U. S. 356, we did not overrule the *Federal Baseball* decision; in fact, we reaffirmed the holding of that case.

When boxers travel from State to State, carrying their shorts and fancy dressing robes in a ditty bag in order to participate in a boxing bout, which is wholly intrastate, it is now held by this Court that the boxing bout becomes interstate commerce. What this Court held in the *Federal Baseball* case to be incident to the exhibition now becomes more important than the exhibition. This is as fine an example of the tail wagging the dog as can be conjured up.

We are not dealing here with the question of whether the appellees have restrained trade in or monopolized the radio and television industries. That is a separate consideration. What others do with pictures they are allowed to take of a wholly local spectacle or exhibition by thereafter using the channels of interstate commerce to exhibit them does not make a package deal. The appellees have nothing to do with the transmission of sound or the pictures. Because these incidents are not directly involved, no effort was made to bring the radio and television companies and the sponsors into the case.

The Court says: "The conspiracy, it is claimed, began in 1949 with an agreement among the defendants and Joe Louis, then heavyweight champion of the world, that Louis would resign his title, . . . procure exclusive rights to the services of the four leading title contenders in a series of elimination contests which would result in the recognition of a new heavyweight champion, . . . and . . . assign all such exclusive rights to the defendants." Of course, there was at the time only one champion, Joe Louis. He had a monopoly on that, and while he got it by competition, he did not get it in trade or commerce. I do not suppose that Joe Louis had to go back into the ring and be walloped to a knockout or a decision before he could surrender his championship. And if he arranged with four other fellows to fight it out in elimination contests for the championship and no one else was restrained from doing the same, it is difficult for me to see how there was any conspiracy. If other promoters wanted to start an elimination contest, they were free to do so. Whether they received public acceptance depended upon something other than trade or commerce. What does a boxer or athlete have for sale but "personal effort, not related to production," which, as Justice Holmes said, is not commerce? Such services they may contract about free from any control of the Sherman Act. Suppose the

appellee did, as the Court states, control what the parties called all but two of twenty-one championship contests, what trade or commerce have they restrained?

As I see it, boxing is not trade or commerce. There can be no monopoly or restraint of nonexistent commerce or trade. Whether Congress can control baseball and boxing I need not speculate. What I am saying is that Congress has not attempted to do so. If there is a conspiracy, it is not one to control commerce between the States.