**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY OF SAN JOSE; CITY OF SAN JOSE
AS SUCCESSOR AGENCY TO THE
REDEVELOPMENT AGENCY OF THE
CITY OF SAN JOSE; THE SAN JOSE
DIRIDON DEVELOPMENT
AUTHORITY,

*Plaintiffs-Appellants*,

v.

OFFICE OF THE COMMISSIONER OF
BASEBALL, an unincorporated
association, DBA Major League
Baseball; ALLAN HUBER SELIG,
"Bud,"

*Defendants-Appellees*.

No. 14-15139

D.C. No.
5:13-cv-02787-
RMW

OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, Senior District Judge, Presiding

Argued and Submitted
August 12, 2014—San Francisco, California

Filed January 15, 2015

Before: Alex Kozinski, Barry G. Silverman
and Richard R. Clifton, Circuit Judges.

Opinion by Judge Kozinski

## SUMMARY[*]

### Antitrust / Baseball Exemption

The panel affirmed the district court's dismissal of the City of San Jose's antitrust action regarding the Office of the Commissioner of Baseball's delay in deciding whether to approve the Oakland Athletics' move to San Jose, which is within the exclusive operating territory of the San Francisco Giants.

The panel held that the baseball industry's historic exemption from the antitrust laws, upheld in *Flood v. Kuhn*, 407 U.S. 258 (1972), barred San Jose's antitrust claim regarding franchise relocation under the Sherman and Clayton Acts and state law. The panel held that under *Portland Baseball Club, Inc. v. Kuhn*, 491 F.2d 1101 (9th Cir. 1972), *Flood* is not limited to baseball's "reserve clause." Rather, antitrust claims against Major League Baseball's franchise relocation policies are in the heartland of those precluded by *Flood*'s rationale.

### COUNSEL

Joseph W. Cotchett (argued), Philip L. Gregory (argued), Frank C. Damrell, Jr., Anne Marie Murphy, Camilo Artiga-Purcell of Cotchett, Pitre & McCarthy, LLP, Burlingame, California, and Richard Doyle, Nora Frimann of the Office of the City Attorney, San Jose, California for Appellants.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

John W. Keker (argued), Paula L. Blizzard, R. Adam Lauridsen, Thomas E. Gorman of Keker & Van Nest LLP, San Francisco, California, and Bradley I. Ruskin of Proskauer Rose LLP, New York, New York, and Scott P. Cooper, Sarah Kroll-Rosenbaum, Jennifer L. Roche, Shawn S. Ledingham, Jr. of Proskauer Rose LLP, Los Angeles, California for Appellees.

## OPINION

KOZINSKI, Circuit Judge:

The City of San Jose steps up to the plate to challenge the baseball industry's 92-year old exemption from the antitrust laws. It joins the long line of litigants that have sought to overturn one of federal law's most enduring anomalies.

## I.  Background

Major League Baseball's (MLB)[1] constitution requires that each of the league's 30 member clubs play their home games within a designated operating territory. For the Oakland Athletics, that territory is comprised of two California counties: Alameda and Contra Costa. Faced with dwindling attendance and revenue, the Athletics want to move to San Jose, which they consider a more profitable

---

[1] The defendants in this case are the "Office of the Commissioner of Baseball," which is an unincorporated association of all 30 MLB clubs, and Allan "Bud" Selig, whose individual job title is Commissioner of MLB. For convenience, we refer to the defendants as "MLB." The plaintiffs in this case are the City of San Jose and the San Jose Diridon Development Authority, which we refer to collectively as "San Jose."

venue. But there's a snag: San Jose falls within the exclusive operating territory of the San Francisco Giants, and relocation to another franchise's territory is prohibited unless approved by at least three-quarters of MLB's clubs.

MLB has not rushed to grant this approval. In 2009, MLB established a "special Relocation Committee" to investigate the implications of the move for the league, but four years later the committee was "still at work," with no resolution in sight. In the meantime, the Athletics moved forward with their plan to build a stadium in San Jose by entering into an option agreement with the city that gave them the right to purchase six parcels of land the city had set aside. But, because MLB hadn't yet approved the move, the Athletics were unable to perform on the agreement, and the land sat idle.

Believing that the delay was MLB's attempt to stymie the relocation and preserve the Giants' local monopoly, San Jose filed suit. It alleged violations of state and federal antitrust laws, of California's consumer protection statute and of California tort law. Relying on the baseball industry's historic exemption from the antitrust laws, the district court granted MLB's motion to dismiss on all but the tort claims.[2] San Jose appeals, arguing that the baseball exemption does not apply to antitrust claims relating to franchise relocation. We review de novo. *See Colony Cove Props., LLC* v. *City of Carson*, 640 F.3d 948, 955 (9th Cir. 2011).

---

[2] The district court subsequently declined to retain supplemental jurisdiction over those state law tort claims and dismissed them without prejudice.

## II. Discussion

Our analysis is governed by three Supreme Court cases decided over the course of half a century; taken together, they set the scope of baseball's exemption from the antitrust laws. *See generally* Stuart Banner, *The Baseball Trust: A History of Baseball's Antitrust Exemption* (2013).  First, in *Federal Baseball Club of Baltimore* v. *National League of Professional Baseball Clubs*, 259 U.S. 200 (1922), the Court, reflecting the era's soon-to-be-outmoded interpretation of the Commerce Clause, held that the Sherman Act had no application to the "business [of] giving exhibitions of base ball" because such "exhibitions" are a "purely state affair[]." *Id.* at 208.

Next up, in *Toolson* v. *New York Yankees, Inc.*, 346 U.S. 356 (1953), the Court, in a short per curiam, affirmed *Federal Baseball*, albeit on a different ground.  *Federal Baseball*'s Commerce Clause underpinning was no longer good law, but the Court recognized that "Congress [] had the [*Federal Baseball*] ruling under consideration [and had] not seen fit to bring [baseball] under the [antitrust] laws by legislation." *Id.* at 357.  As such, "[t]he business [was] left for thirty years to develop, on the understanding that it was not subject to existing antitrust legislation," and the Court determined that even if there were circumstances that "warrant[ed] application [] of the antitrust laws[, such laws] should be [applied] by legislation." *Id.*  "Without re-examination of the underlying issues," the Court reaffirmed *Federal Baseball*'s central holding that "the business of providing public baseball games for profit between clubs of professional baseball players was not within the scope of the federal antitrust laws." *Id.*

Finally in *Flood* v. *Kuhn*, 407 U.S. 258 (1972), the Court once again upheld the baseball exemption, this time in a lengthy, reasoned opinion.[3]  The Court noted "the confusion and the retroactivity problems that inevitably would result with a judicial overturning of *Federal Baseball*" and again stated its "preference that if any change is to be made, it come by legislative action." *Id.* at 283.  In particular, the Court stressed that Congress had acquiesced in the baseball exemption and thus "by its positive inaction . . . clearly evinced a desire not to disapprove [it] legislatively." *Id.* at 283–84.  *Flood* and its progenitors, therefore, upheld the baseball exemption for two fundamental reasons: (1) fidelity to the principle of stare decisis and the concomitant aversion to disturbing reliance interests created by the exemption; and (2) Congress's apparent acquiescence in the holdings of *Federal Baseball* and *Toolson*.

San Jose first argues that *Flood* applies only to baseball's "reserve clause"[4]—the particular provision at issue in that case—and not to other facets of the baseball industry, like franchise relocation.  In other words, San Jose urges that we limit *Flood* to its facts.  Such a drastic limitation on *Flood*'s scope is foreclosed by our precedent.  Under the baseball exemption, we have rejected an antitrust claim that was wholly unrelated to the reserve clause. *See Portland Baseball*

---

[3] Some thought, too lengthy.  *See* 407 U.S. at 285.

[4] The "reserve clause" was a provision in baseball contracts that prevented players from signing with other clubs, even after their contracts had expired, without the express consent of the club they played for.

*Club, Inc.* v. *Kuhn*, 491 F.2d 1101, 1103 (9th Cir. 1974). In *Portland Baseball*, a former minor league franchise owner brought suit against MLB. The owner argued that MLB failed to comply with the terms of an agreement it struck with minor league teams to provide compensation in the event a major league franchise moved into a minor league franchise's territory. *Id.* at 1102. One of the plaintiff's claims was that MLB's monopolization of the baseball industry rendered minor league teams unable to negotiate on fair terms. *Portland Baseball Club, Inc.* v. *Kuhn*, 368 F. Supp. 1004, 1009 (D. Or. 1971). Even though the antitrust claim in *Portland Baseball* had nothing to do with the reserve clause, we cited *Flood* in upholding the claim's dismissal. *Portland Baseball*, 491 F.2d at 1103. *Portland Baseball* may not define precisely the boundaries of the baseball exemption, but it fatally undercuts San Jose's attempt to restrict *Flood* to the reserve clause.

San Jose next contends that if we are to hold that the baseball exemption extends beyond the reserve clause, we must remand to the district court to determine whether franchise relocation is sufficiently related to "baseball's unique characteristics and needs" to warrant exemption. This argument appears to be derived from a single sentence in *Flood*, which states that the baseball exemption "rests on a recognition and an acceptance of baseball's unique characteristics and needs." *Flood*, 407 U.S. at 282. From this line alone, San Jose argues that the *Flood* Court intended a fact-sensitive inquiry whenever the antitrust exemption is challenged. But, aside from the isolated language San Jose quotes, nothing in *Flood* suggests that the reserve clause was exempted based on some fact-sensitive analysis of the role the clause played within the baseball industry.

Rather, *Flood*'s stare decisis and congressional acquiescence rationales suggest the Court intended the exemption to have the same scope as the exemption established in *Federal Baseball* and *Toolson*. After all, it would make little sense for *Flood* to have contracted (or expanded) the exemption from the one established in the cases in which Congress acquiesced and which generated reliance interests. And *Federal Baseball* and *Toolson* clearly extend the baseball exemption to the entire "business of providing public baseball games for profit between clubs of professional baseball players." *Toolson*, 346 U.S. at 357; *see also Radovich* v. *Nat'l Football League*, 352 U.S. 445, 451 (1957) (noting that the antitrust exemption articulated in *Federal Baseball* and *Toolson* applies to "the business of organized professional baseball."); *Charles O. Finley & Co., Inc.* v. *Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978) ("Despite the two references in the *Flood* case to the reserve system, it appears clear from the entire opinions in the three baseball cases, as well as from *Radovich*, that the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws.") (footnote omitted).

It is undisputed that restrictions on franchise relocation relate to the "business of providing public baseball games for profit between clubs of professional baseball players." *Toolson*, 346 U.S. at 357. The designation of franchises to particular geographic territories is the league's basic organizing principle. Limitations on franchise relocation are designed to ensure access to baseball games for a broad range of markets and to safeguard the profitability—and thus viability—of each ball club. Interfering with franchise relocation rules therefore indisputably interferes with the public exhibition of professional baseball. *See Prof'l*

*Baseball Sch. & Clubs, Inc.* v. *Kuhn*, 693 F.2d 1085, 1086 (11th Cir. 1982) (rejecting an antitrust challenge to baseball franchise relocation because it is "an integral part of the business of baseball").

That doesn't necessarily mean all antitrust suits that touch on the baseball industry are barred.     In *Twin City Sportservice, Inc.* v. *Charles O. Finley & Co., Inc.*, 512 F.2d 1264 (9th Cir. 1975), for example, we assessed an antitrust claim by a baseball franchise against stadium concessionaires without any reference to the baseball exemption.  Nor does it mean that MLB or its franchises are immune from antitrust suit.  There might be activities that MLB and its franchises engage in that are wholly collateral to the public display of baseball games, and for which antitrust liability may therefore attach.  But San Jose does not—and cannot—allege that franchise relocation is such an activity.  To the contrary, few, if any, issues are as central to a sports league's proper functioning as its rules regarding the geographic designation of franchises.

*Flood*'s congressional acquiescence rationale applies with special force to franchise relocation.  In 1998, Congress passed the Curt Flood Act, which withdrew baseball's antitrust exemption with respect to the reserve clause and other labor issues, but explicitly *maintained* it for franchise relocation.  *See* Pub. L. No. 105-297, § 3(b)(3), 112 Stat. 2824 (1998) (codified at 15 U.S.C. § 26b(b)(3)) ("This section does not create, permit or imply a cause of action by which to challenge under the antitrust laws, or otherwise apply the antitrust laws to . . . franchise [] location or relocation").

In an ordinary case, congressional inaction "lacks persuasive significance because several equally tenable inferences may be drawn from such inaction." *Pension Benefit Guar. Corp.* v. *LTV Corp.*, 496 U.S. 633, 650 (1990) (internal quotation marks omitted). But when Congress specifically legislates in a field and explicitly exempts an issue from that legislation, our ability to infer congressional intent to leave that issue undisturbed is at its apex. *See, e.g.*, *Kimbrough* v. *United States*, 552 U.S. 85, 106 (2007) (congressional inaction is probative when Congress "fail[s] to act on a proposed amendment . . . in a high-profile area in which it had previously exercised its [] authority"). The exclusion of franchise relocation from the Curt Flood Act demonstrates that Congress (1) was aware of the possibility that the baseball exemption could apply to franchise relocation; (2) declined to alter the status quo with respect to relocation; and (3) had sufficient will to overturn the exemption in other areas. *Flood*'s clear implication is that the scope of the baseball exemption is coextensive with the degree of congressional acquiescence, and the case for congressional acquiescence with respect to franchise relocation is in fact far stronger than it was for the reserve clause at issue in *Flood* itself.

In short, antitrust claims against MLB's franchise relocation policies are in the heartland of those precluded by *Flood*'s rationale. San Jose's claims under the Sherman and Clayton Acts must accordingly be dismissed.

And San Jose's state antitrust claims necessarily fall with its federal claims. Baseball is an exception to the normal rule that "federal antitrust laws [] supplement, not displace, state antitrust remedies." *California* v. *ARC Am. Corp.*, 490 U.S. 93, 102 (1989). In *Flood*, the Court affirmed the dismissal of

the plaintiff's state law claims because "state antitrust regulation would conflict with federal policy and because national uniformity is required in any regulation of baseball." *Flood*, 407 U.S. at 284 (internal quotation marks omitted). In other words, the Court in *Flood* determined that state antitrust claims constitute an impermissible end run around the baseball exemption. San Jose can point to no case that has ever held that state antitrust claims continue to be viable after federal antitrust claims have been dismissed under the baseball exemption. *See, e.g.*, *Major League Baseball* v. *Crist*, 331 F.3d 1177, 1179 (11th Cir. 2003) (holding that state antitrust claims are preempted if they mirror federal claims that fall within the baseball exemption). That suffices to reject San Jose's state antitrust claims, which entirely duplicate its claims under the federal antitrust laws.

San Jose also alleges a violation of California's unfair competition law (UCL). However, under California law, "[i]f the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers." *Chavez* v. *Whirlpool Corp.*, 113 Cal. Rptr. 2d 175, 184 (Ct. App. 2001). An independent claim under California's UCL is therefore barred so long as MLB's activities are lawful under the antitrust laws.[5]

---

[5] MLB also argues that San Jose lacks antitrust standing to bring this challenge. However, "[u]nlike Article III standing, the question of standing to sue under the antitrust laws does not go to subject matter jurisdiction, and thus need not be considered" before addressing the merits. *Datagate, Inc.* v. *Hewlett-Packard Co.*, 60 F.3d 1421, 1425 n.1

*                    *                    *

Like Casey, San Jose has struck out here. The scope of the Supreme Court's holding in *Flood* plainly extends to questions of franchise relocation. San Jose is, at bottom, asking us to deem *Flood* wrongly decided, and that we cannot do. Only Congress and the Supreme Court are empowered to question *Flood*'s continued vitality, and with it, the fate of baseball's singular and historic exemption from the antitrust laws.[6]

**AFFIRMED.**

---

(9th Cir. 1995). Because we affirm on the basis of the baseball exemption, we need not reach the question of San Jose's standing.

[6] In light of our disposition, all pending motions are denied as moot.