**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SERGIO MIRANDA; JEFFREY
DOMINGUEZ; JORGE PADILLA;
and CIRILO CRUZ, Individually
and on Behalf of All Those
Similarly Situated,
        *Plaintiffs-Appellants*,

v.

ALLAN HUBER SELIG, Bud;
KANSAS CITY ROYALS
BASEBALL CORP.; MIAMI
MARLINS, L.P.; SAN FRANCISCO
BASEBALL ASSOCIATES, LLC;
BOSTON RED SOX BASEBALL
CLUB L.P.; ANGELS BASEBALL
L.P.; CHICAGO WHITE SOX
LTD.; ST. LOUIS CARDINALS,
LLC; COLORADO ROCKIES
BASEBALL CLUB, LTD.;
BASEBALL CLUB OF SEATTLE,
LLP; CINCINNATI REDS, LLC;
HOUSTON BASEBALL PARTNERS,
LLC; ATHLETICS INVESTMENT
GROUP, LLC; ROGERS BLUE
JAYS BASEBALL PARTNERSHIP;
CLEVELAND INDIANS BASEBALL
CO., L.P.; CLEVELAND INDIANS
BASEBALL CO., INC.; PADRES

No. 15-16938

D.C. No.
3:14-cv-05349-HSG

OPINION

L.P.; SAN DIEGO PADRES
BASEBALL CLUB, L.P.;
MINNESOTA TWINS, LLC;
WASHINGTON NATIONALS
BASEBALL CLUB, LLC; DETROIT
TIGERS, INC.; LOS ANGELES
DODGERS HOLDING CO.;
STERLING METS L.P.; ATLANTA
NATIONAL LEAGUE BASEBALL
CLUB, INC.; AZPB L.P.;
BALTIMORE ORIOLES, INC.;
BALTIMORE ORIOLES, L.P.;
PHILLIES L.P.; PITTSBURGH
BASEBALL, INC.; PITTSBURGH
BASEBALL P'SHIP; NEW YORK
YANKEES P'SHIP; TAMPA BAY
RAYS BASEBALL LTD.; RANGERS
BASEBALL EXPRESS, LLC;
RANGERS BASEBALL, LLC;
CHICAGO BASEBALL HOLDINGS,
LLC; MILWAUKEE BREWERS
BASEBALL CLUB, INC.;
MILWAUKEE BREWERS
BASEBALL CLUB, L.P.; OFFICE OF
COMMISSIONER OF BASEBALL,
DBA Major League Baseball;
LOS ANGELES DODGERS, LLC,
*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted April 18, 2017
San Francisco, California

Filed June 26, 2017

Before: Sidney R. Thomas, Chief Judge, and Ferdinand F.
Fernandez and Mary H. Murguia, Circuit Judges.

Opinion by Chief Judge Thomas

## SUMMARY[*]

### Antitrust

Affirming the district court's dismissal of an antitrust suit brought by minor league baseball players, the panel held that professional minor league baseball is exempt from federal antitrust laws.

The panel concluded that because it was bound by Supreme Court and Ninth Circuit precedent upholding the business of baseball's exemption from federal antitrust laws, and because Congress explicitly exempted minor league baseball in the Curt Flood Act of 1998, the players failed to state an antitrust claim.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Samuel Kornhauser (argued) and David Truong, Law Offices of Samuel Kornhauser, San Francisco, California; Brian David, Law Offices of Brian David, Chicago, Illinois; for Plaintiffs-Appellants.

John W. Keker (argued), David J. Rosen, Thomas E. Gorman, and R. Adam Lauridsen, Keker & Van Nest LLP, San Francisco, California, for Defendants-Appellees.

**OPINION**

THOMAS, Chief Judge:

In this case we consider whether professional minor league baseball is exempt from federal antitrust law. Applying controlling precedent, we hold that it is, and we affirm the judgment of the district court.

I

Major League Baseball ("MLB") is an unincorporated association consisting of thirty MLB franchises, also known as clubs or teams. Each franchise employs approximately forty baseball players on its "40-man roster," with up to twenty-five players on its "active roster," who play at the major league level. As part of MLB's "farm system," each franchise also employs 150 to 250 players who compete at the minor league level. MLB franchises employ a high number of minor league players hoping that a handful will develop into major league players. Therefore, though minor league

players train and play for minor league clubs, they are nonetheless employed by an MLB club.

MLB requires all franchises to use its Uniform Player Contract ("the Contract") when hiring minor league players. Any change to the Contract terms requires permission from the MLB Commissioner. Once completed, all Contracts are filed with the MLB Commissioner for approval. Under the Contract's so-called "reserve clause," MLB franchises receive exclusive rights to their minor league players for seven championship seasons, approximately seven years. This provision precludes players from playing for any other baseball team during the contract period, whether or not the team is an MLB franchise. However, MLB franchises have the power to transfer amongst themselves their exclusive rights to a player at the end of each contract season.

The Contract sets forth minor league players' first-season monthly salary rate. For each subsequent season, players and clubs are supposed to negotiate a monthly salary. If a player and club are unable to reach an agreement, the monthly salary rate is determined in the same manner as the first-season salary. Unlike major league baseball players, minor league players do not belong to a labor union and therefore must engage in negotiations independently.

Although MLB's salary guidelines are not publicly available, the plaintiffs, a class of minor league baseball players ("the Players") allege MLB requires that all first-year minor league players earn $1,100 per month, Class-A minor league players earn $1,250 per month, Class-AA minor league players earn $1,500 per month, and Class-AAA minor league players earn $2,150 per month. The Players allege that most minor league players earn less than $7,500 per year,

with some earning as little as $3,000. Minor league players receive no salary for spring training, during which they work fifty to sixty hours per week.

## II

On February 5, 2015, the Players filed a complaint against the Office of the Commissioner of Baseball, former Commissioner Allan Huber "Bud" Selig, and MLB's thirty franchises (collectively, "the Owners"). Each class representative played minor league baseball at some point between 2010 and 2012. While employed as minor league players, the class representatives worked an average of fifty to sixty hours per week and earned less than $10,000 per year. Seeking declaratory and injunctive relief as well as damages, the Players allege that MLB's hiring and employment policies have violated federal antitrust laws by "restrain[ing] horizontal competition between and among" the MLB franchises and "artificially and illegally depressing" minor league salaries.

The Owners filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the business of baseball has long been exempt from federal antitrust laws, and Congress specifically declined to take minor league baseball out of the scope of the exemption. The district court granted the Owners' motion to dismiss and the Players timely appealed.

## III

We have jurisdiction under 28 U.S.C. § 1291, and we review the district court's order de novo. *See, e.g.*, *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1029, 1031

(9th Cir. 2016). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must raise sufficient factual allegations, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Because we are bound by Supreme Court and Ninth Circuit precedent upholding the business of baseball's exemption from federal antitrust laws, and because Congress explicitly exempted minor league baseball in the Curt Flood Act of 1998, the Players have not "state[d] a claim to relief that is plausible on its face." *Id.* We affirm.

## A

The business-of-baseball exemption is best understood within its historical context. In 1890, Congress passed the Sherman Act "to protect trade and commerce against unlawful restraints and monopolies." Sherman Act, ch. 647, 26 Stat. 209 (1890). Under the Sherman Act, "[e]very contract . . . in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. It is also a felony under the Sherman Act to "monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. In 1914, Congress passed the Clayton Act to supplement existing federal antitrust law. Clayton Act, ch. 323, 38 Stat. 731 (1914). Section 4 of the Clayton Act establishes that those injured "by reason of anything forbidden in the antitrust laws may sue" in federal district court. 15 U.S.C. § 15(a).

The Supreme Court first exempted the business of baseball from these federal antitrust laws almost a century ago in *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*, 259 U.S. 200 (1922). In *Federal Baseball*, the Supreme Court held that the business

of baseball does not constitute "trade or commerce among the several States," 15 U.S.C. § 1, and therefore is not bound by antitrust laws, because the "business is giving exhibitions of base ball, which are purely state affairs." *Federal Baseball*, 259 U.S. at 208. Comparing the baseball league to a law firm sending a lawyer to another state to argue a case, the Court reasoned that the need for baseball teams to cross state lines to attend competitions was "mere[ly] incident[al]" to the business itself. *Id.* at 209.

The Court revisited the baseball exemption thirty years later in *Toolson v. New York Yankees, Inc.*, 346 U.S. 356 (1953) (per curiam). In a one-paragraph per curiam opinion, and over Justice Burton's dissent, the Court declined to overrule *Federal Baseball*, reasoning that the business of baseball had "been left for thirty years to develop, on the understanding that it was not subject to existing antitrust legislation." *Toolson*, 346 U.S. at 357. Therefore, "if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation." *Id.*

In the years after deciding *Toolson*, the Supreme Court considered antitrust claims brought against defendants engaged in the business of traveling theater companies, *United States v. Shubert*, 348 U.S. 222 (1955), professional boxing, *United States v. Int'l Boxing Club of N.Y.*, 348 U.S. 236 (1955), professional football, *Radovich v. Nat'l Football League*, 352 U.S. 445 (1957), and professional basketball, *Haywood v. Nat'l Basketball Ass'n*, 401 U.S. 1204 (1971). In each case, the Supreme Court held that the exemption articulated in *Federal Baseball* did not extend to sports or entertainment beyond baseball. *See Shubert*, 348 U.S. at 228; *Boxing Club*, 348 U.S. at 243; *Radovich*, 352 U.S. at 452; *Haywood*, 401 U.S. at 1205. Adopting the reasoning from

*Toolson*, the Court also stated in *Shubert*, *Boxing Club*, and *Radovich* that it was the role of Congress—not the courts—to create additional exceptions to federal antitrust laws. *See Shubert*, 348 U.S. at 230 ("If the *Toolson* holding is to be expanded—or contracted—the appropriate remedy lies with Congress."); *Boxing Club*, 348 U.S. at 243 ("The issue confronting us is, therefore, not whether a previously granted exemption should continue, but whether an exemption should be granted in the first instance. And that issue is for Congress to resolve, not this Court."); *Radovich*, 352 U.S. at 451 ("As long as the Congress continues to acquiesce we should adhere to—but not extend—the interpretation of the Act made in [*Federal Baseball* and *Toolson*].").[1]

The Supreme Court once again upheld the baseball exemption in *Flood v. Kuhn*, 407 U.S. 258 (1972), and, unlike

---

[1] These holdings were not without controversy. Justice Frankfurter dissented in *Boxing Club* and *Radovich*, arguing that the doctrine of stare decisis required the Court to exempt boxing and football from antitrust laws as well. *Boxing Club*, 348 U.S. at 248–51 ("It would baffle the subtlest ingenuity to find a single differentiating factor between other sporting exhibitions . . . and baseball insofar as the conduct of the sport is relevant to the criteria or considerations by which the Sherman Law becomes applicable to a 'trade or commerce.'") (Frankfurter, J., dissenting); *Radovich*, 352 U.S. at 455–56. Justice Harlan, joined by Justice Brennan, dissented in *Radovich* for similar reasons. *Radovich*, 352 U.S. at 456 ("Since I am unable to distinguish football from baseball under the rationale of *Federal Base Ball* and *Toolson*, and can find no basis for attributing to Congress a purpose to put baseball in a class by itself, I would adhere to the rule of stare decisis and affirm the judgment below.") (Harlan, J., dissenting). Justice Minton dissented in *Boxing Club* based on his belief that boxing is neither trade nor commerce. *Boxing Club*, 348 U.S. at 251–53 ("What this Court held in the *Federal Baseball* case to be incident to the exhibition now becomes more important than the exhibition. This is as fine an example of the tail wagging the dog as can be conjured up.") (Minton, J., dissenting).

in *Toolson*, it provided a lengthy explanation for its holding. The Court discussed in detail the cases described above. *Flood*, 407 U.S. at 274–80.  It also noted that numerous bills had been introduced in Congress regarding the applicability or nonapplicability of antitrust laws to baseball, yet none passed both houses of Congress. *See id.* at 281.  Furthermore, it noted that bills that passed one house of Congress expanded rather than restricted the exemption. *Id.* at 281–82.  In light of the case law and legislative history, the Court acknowledged that (1) "[p]rofessional baseball is . . . engaged in interstate commerce"; (2) "baseball is . . . an exception and an anomaly" with regard to its exemption from federal antitrust laws; (3) though it may be considered "unrealistic, inconsistent, or illogical," this exemption is well-established and does not extend to boxing, football, basketball, and, presumably, other sports; (4) the Supreme Court has previously emphasized that Congress allowed professional baseball to develop and expand unhindered by federal antitrust laws, even in the advent of radio and television; and (5) the Court has also "expressed concern about the confusion and retroactivity problems that inevitably would result with a judicial overturning of *Federal Baseball*" and its progeny, and, therefore, any change should be made by Congress and not the courts. *Flood*, 407 U.S. at 282–83.  Thus, the *Flood* Court declined to overrule *Federal Baseball* and *Toolson*, holding, once again, that professional baseball is exempt from federal antitrust laws. *Id.* at 284–85.

B

In 1998, Congress passed the Curt Flood Act, taking long-awaited action on the business-of-baseball exemption.  Curt Flood Act of 1998, Pub. L. No. 105-297, 112 Stat. 2824 (codified at 15 U.S.C. § 266).    The Curt Flood Act

established that "the conduct, acts, practices, or agreements of persons in the business of organized professional major league baseball directly relating to or affecting employment of major league baseball players . . . are subject to the antitrust laws." 15 U.S.C. § 26b(a). However, it explicitly maintained the baseball exemption for anything related to the employment of minor league baseball players—including the use of reserve clauses—and the relationship between organized professional major and minor league baseball. 15 U.S.C. § 26b(b)(1)–(2).

C

In *City of San Jose v. Office of the Commissioner of Baseball*, 776 F.3d 686 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 36, 36 (2015), we held that restrictions on franchise relocation fall squarely within the "business of baseball" and are therefore exempt from federal antitrust laws under *Flood*. We reasoned that this was particularly evident because the Curt Flood Act "withdrew baseball's antitrust exemption with respect to the reserve clause and other labor issues [for major league players], but explicitly maintained it for franchise relocation." *Id.* at 690.

Considering the case law and the Curt Flood Act, it is undeniably true that minor league baseball—particularly the employment of minor league baseball players and the requirement that they sign a uniform contract containing a reserve clause—falls squarely within baseball's exemption from federal antitrust laws. Even more than the franchise relocation rules at issue in *San Jose*, the employment contracts of minor league players "relate to the 'business of providing public baseball games for profit between clubs of professional baseball players.'" *San Jose*, 776 F.3d at 690

(quoting *Toolson*, 346 U.S. at 357). Indeed, MLB's reserve clause, albeit as applied to major league players, is precisely what was challenged in *Flood*, where the Supreme Court determined, once again, to uphold the baseball exemption. *Flood*, 407 U.S. at 259, 284.

The Players argue that the baseball exemption does not apply to minor league baseball because *Federal Baseball*, *Toolson*, and *Flood* did not decide the issue of "whether major league baseball and its constituent clubs could conspire to fix the salaries paid to *minor league* players." However, MLB's farming structure belies the claim that major and minor league baseball are separate and distinct in a meaningful way for the purposes of the Sherman Act. Minor league baseball players are employed and paid by MLB, and MLB employs minor league players with the hope that some of them will develop into major league players. Therefore, the employment of minor league players is precisely the type of activity that falls within the antitrust exemption for the business of baseball.

Citing *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), the Players insist that we can "refuse[] to apply *stare decisis*" and decline to follow *Federal Baseball*, *Toolson*, and *Flood*. Specifically, the Players argue that we, like the Supreme Court in *Leegin*, should not "blindly apply[] outmoded, erroneous reasoning to an antitrust case," especially in light of economic changes that have occurred since *Federal Baseball*.

The Players misapprehend the doctrine of *stare decisis*, particularly as it applies to intermediate federal appellate courts. Courts of Appeal must adhere to the controlling decisions of the Supreme Court. *See Hutto v. Davis*, 454 U.S.

370, 375 (1982) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of [the Supreme] Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."); *Nunez-Reyes v. Holder*, 646 F.3d 684, 692 (9th Cir. 2011) ("'we are bound to follow a controlling Supreme Court precedent until it is explicitly overruled by that Court.'") (quoting *United States v. Weiland*, 420 F.3d 1062, 1079 n. 16 (9th Cir. 2005)).

Further, under the law-of-the-circuit rule, "[w]e are bound by decisions of prior panels' [sic] unless an en banc decision, Supreme Court decision, or subsequent legislation undermines those decisions." *Baker v. Delta Air Lines, Inc.*, 6 F.3d 632, 637 (9th Cir. 1993) (internal quotation marks and citation omitted).[2]

The Supreme Court may, of course, overrule its own prior precedent. *See Payne v. Tennessee*, 501 U.S. 808, 827–28 (1991) ("Nevertheless, when governing decisions are unworkable or are badly reasoned, 'this Court has never felt constrained to follow precedent.'") (quoting *Smith v. Allwright*, 321 U.S. 649, 665 (1944)). Nonetheless, even at the Supreme Court, "*[s]tare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Id.* at 827.

Both the Supreme Court and our Court have repeatedly upheld the business-of-baseball exemption, and as recently as

---

[2] The exceptions to the rule, as noted in *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003), are not applicable here.

2015. *See Flood*, 407 U.S. at 284; *Toolson*, 346 U.S. at 357; *Shubert*, 348 U.S. at 228; *Boxing Club*, 348 U.S. at 243; *Radovich*, 352 U.S. at 452; *Haywood*, 401 U.S. at 1205; *San Jose*, 776 F.3d at 692. We are bound by these decisions. Indeed, even if the Supreme Court had not spoken on this issue, the Players are unable to point to any of the narrow circumstances that would justify departure from our own circuit precedent.

Moreover, Congress has made clear its intent to maintain the baseball exemption for anything related to the employment of minor league players, the reserve clause as applied to minor league players, and the relationship between major and minor league baseball. 15 U.S.C. § 26b(b). As we recently stated in *San Jose*, "when Congress specifically legislates in a field and explicitly exempts an issue from that legislation, our ability to infer congressional intent to leave that issue undisturbed is at its apex." *San Jose*, 776 F.3d at 691 (citing *Kimbrough v. United States*, 552 U.S. 85, 106 (2007)). "The exclusion of [organized professional minor league baseball] from the Curt Flood Act demonstrates that Congress (1) was aware of the possibility that the baseball exemption could apply to [minor league baseball]; (2) declined to alter the status quo with respect to [minor league baseball]; and (3) had sufficient will to overturn the exemption in other areas." *Id.*

IV

In light of Supreme Court precedent, the decisions of our Court, and the Curt Flood Act, minor league baseball falls

squarely within the nearly century-old business-of-baseball exemption from federal antitrust laws.

**AFFIRMED**.